UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-61006-ALTMAN/Hunt

RANDALL PURCELL, *et al.*,

     *Plaintiffs,*

*v.*

CITY OF FORT LAUDERDALE,
*et al.*,

     *Defendants.*

_____/

## ORDER

On the night of April 6, 2017, Raymond Purcell[1] (one of our Plaintiffs) called the police to report that he "was the victim of car vandalism[.]" Complaint [ECF No. 1-1] ¶ 14. By the time the dust settled, two City of Fort Lauderdale police officers had detained, arrested, and deployed force against Raymond and his brother, Randall Purcell (our second Plaintiff). The parties have now filed cross-motions for summary judgment on many of the issues arising from the Plaintiffs' ten-count Complaint. *See* Defendants' Combined Motion for Summary Judgment ("Defendants' MSJ") [ECF No. 110]; Motion for Partial Summary Judgment ("Plaintiffs' MSJ") [ECF No. 113].[2] After careful review, we **GRANT** the Defendants' MSJ as to Count VII, **DENY** the rest of the Defendants' MSJ, and **DENY** the Plaintiffs' MSJ in its entirety.

---

[1] Unfortunately, Raymond Purcell died during the pendency of this litigation. *See* June 7, 2024 Paperless Order [ECF No. 137] ("One of the Plaintiffs, Raymond Purcell, has passed away."). Pursuant to FED. R. CIV. P. 25(a)(1), we substituted "Teria Rand, as the Personal Representative of the Estate of Raymond Purcell," in Raymond's place. *Ibid.*

[2] Both motions are fully briefed and ripe for adjudication. *See* Plaintiffs' Response in Opposition to Defendants' Combined Motion for Summary Judgment ("Response to Defendants' MSJ") [ECF No. 123]; Defendants' Combined Reply Memorandum ("Reply to Defendants' MSJ") [ECF No. 132]; Defendants' Combined Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Response to Plaintiffs' MSJ") [ECF No. 119]; Amended Reply in Support of Plaintiffs' Motion for Partial Summary Judgment ("Reply to Plaintiffs' MSJ") [ECF No. 126].

THE FACTS[3]

## I.      The April 6, 2017 Incident

In April 2017, Raymond was "living in a home at 3271 Riverland Road in Fort Lauderdale with his then-girlfriend, Jackie Stanley Islam." Joint Statement of Material Facts ("Joint SOF") [ECF No. 133] ¶ 1. Raymond's brother Randall was "staying in a motor home outside Raymond's house," and Raymond's sister, Sheila Purcell, was "staying outside with Randall in the motor home" because she was visiting from Kentucky "to get medications from her doctor." *Ibid.* Sheila "was not allowed to stay in Raymond's house[.]" *Ibid.*

On April 6, "Sheila became mad at Raymond because he was late to take her to a doctor." *Id.* ¶ 2. Things quickly became heated: Sheila "threw a hissy fit and went after Jackie"; Raymond repeatedly demanded that Shelia leave; and Jackie called the police when Shelia refused to leave. *Ibid.* Around the same time, Raymond called his brother Randall—who "was fishing at a boat ramp down the street"—"to come home and help mediate Raymond's fight with Sheila." *Id.* ¶ 3. By the time Randall returned, Raymond "was outside 'ranting,'" and Shelia "was inside the mobile home crying." *Ibid.* It was during this "domestic dispute" that two City of Fort Lauderdale police officers responded

---

[3] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016) (Proctor, J.); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up). In adjudicating cross-motions, then, we consider each motion separately and, of course, resolve all reasonable inferences against the movant. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

to Raymond's home: Officers Steven Pohorence and Alexander Paul (the "Officer Defendants"). *See id.* ¶ 4.

Upon arriving at the Plaintiffs' home, Officer Paul rang the doorbell and was greeted by Raymond. *See ibid.* ("According to Raymond, Officer Paul rang the doorbell and then ran out to the front yard. Raymond opened the door and said, 'Can I help you[?]'"). Officer Paul purportedly "snapped his fingers, pointed to the ground, and allegedly said [to Raymond], 'I want you out here, boy' and 'I want you out here son.'" *Ibid.* Raymond responded: "I'm not your boy, I'm not your son and I damn sure ain't your dog. It seems to me you have anger management issues." *Ibid.* Officer Paul and Raymond continued to have a back-and-forth until Raymond "closed the door, went inside, and 'let Jackie handle it.'" *Ibid.* At some point, Officer Paul learned that Raymond owned a firearm and that it was in his vehicle. *See* Defendants' Statement of Material Facts ("Defendants' SOF") [ECF No. 109] ¶ 5 ("[Officer Paul] asked Raymond if there were any weapons in the house . . . Raymond became 'offended' and 'agitated' when asked . . . but advised there may be a pistol in the car[.]"); *see also* Plaintiffs' Response to Defendants' Statement of Material Facts ("Plaintiffs' Response SOF") [ECF No. 122] ¶ 5 ("Disputed as to ¶ 5. Raymond calmly informed Paul that he had a firearm and it was in his car.").[4] The Officer Defendants also observed "bladed weapons from Star Trek hanging on the wall" of Raymond's home. Defendants' SOF ¶ 6; *see also* Plaintiffs' Response SOF ¶ 6 ("The Klingon

---

[4] Where (as here) one party disputes only a portion of the opposing party's material fact, we presume that the rest of that material fact is admitted unless there's record evidence to suggest otherwise. *See* S.D. FLA. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts[.]"); *see also, e.g.*, *Williams v. Mallet*, 2023 WL 8769726, at *3 n.6 (S.D. Fla. Dec. 19, 2023) (Altman, J.) ("Williams 'disputes' this entire assertion. But, in his disputation, he only *really* objects to the Defendants' characterization of what he was *doing* in the car . . . . Since he doesn't dispute the time or place of the encounter—or the fact that he was sitting 'partially inside the passenger side of a parked vehicle next to an open field' with the 'passenger door wide open'—we'll deem those facts admitted."). So, for example, we'll only accept as undisputed the Defendants' assertion that Raymond told Officer Paul that he owned a firearm and that it was in his car (because the Plaintiffs never dispute this point), though we still recognize a dispute about whether Raymond was "agitated" or "calm" when he relayed this information.

objects on the wall are not 'weapons.' They are Star Trek memorabilia and artifacts, but are in no way weapons useful for harming anyone.").

Ultimately, Raymond, Jackie, and the Officer Defendants agreed "that Sheila would be allowed to stay outside in the motor home, but she was not to come back into the house." Joint SOF ¶ 5. Raymond believed that the Officer Defendants "relayed the information to Sheila . . . and then left." *Ibid.* Randall was in the home when the Officer Defendants arrived but "did not overhear their discussion" with Raymond and Jackie, nor did he "observe any difficulties in the interaction between Raymond and the Officers." *Ibid.* This initial encounter with the Officer Defendants lasted at least fifteen to twenty minutes. *See* Defendants' SOF ¶ 7 ("The Officers were initially on scene for 15–20 minutes."); Plaintiffs' Response SOF ¶ 7 ("Disputed as to ¶ 7. The Officers were there for longer than 15–20 minutes during the first encounter.").

Later that evening, someone—Raymond presumes it was Sheila —"keyed [Raymond's] PT Cruiser convertible," "punctured holes in [the PT Cruiser's] roof," and "keyed Raymond's red pickup from the front to the back." Plaintiffs' Statement of Material Facts ("Plaintiffs' SOF") [ECF No. 112] ¶ 3; *see also* Defendants' Response to Plaintiffs' Statement of Material Facts ("Defendants' Response SOF") [ECF No. 118] ¶ 3 ("Undisputed that this is Raymond Purcell's presumption."). Raymond and Jackie called the police "to report the vandalism." Plaintiffs' SOF ¶ 4; *see also* Defendants' Response SOF ¶ 4 ("Undisputed."). The first person to respond to the scene was an "accident reporter." Joint SOF ¶ 6. The Officer Defendants were later dispatched to Raymond's home to investigate the "vandalism of [the] vehicles." *Id.* ¶ 7.[5] Raymond was "irate" and "mad" at the Officer Defendants "for

---

[5] The Defendants allege that Raymond "called and requested that the original two officers return to the house and report the damage to the vehicle." Defendants' SOF ¶ 10; *see also* Randall Purcell Deposition Tr. ("Randall Depo.") [ECF No. 108-10] at 70:20–23 ("Q: Okay. So it is your recollection that Raymond asked the police department to send the same two officers that had been there earlier? A: Because they were there earlier."). The Plaintiffs dispute this. *See* Plaintiffs' Response SOF ¶ 10 ("Disputed as to ¶ 10. Raymond did not ask for the same officers to return and did not know the same two officers would return."); Raymond Purcell Deposition Tr. ("Raymond Depo.") [ECF No. 108-9]

how long it had taken them to respond." *Ibid*. Raymond informed the Officer Defendants "that his sister had keyed both vehicles and that he wanted her arrested." *Ibid*. He also showed the Officer Defendants the damage to his vehicles by using "a small, high-intensity flashlight." Joint SOF ¶ 9.

After inspecting the damage, Officer Pohorence "said it looked like a hundred dollars in damages, which Raymond considered 'an insult.'" *Id.* ¶ 8. The Officer Defendants told Raymond that they "could not arrest [Raymond's sister] because she committed a misdemeanor (under $1,000 [of property damage]) outside their presence." Plaintiffs' SOF ¶ 5; *see also* Defendants' Response SOF ¶ 5 ("Undisputed that any misdemeanor crime was committed outside the presence of the officers[.]"). The Plaintiffs insist—over the Defendants' protestations—that the Officer Defendants also "refused to file a police report[.]" Plaintiffs' SOF ¶ 6; *see also* Defendants' Response SOF ¶ 6 ("Disputed that the Officers refused to file a police report."). Frustrated by the Officer Defendants, Raymond "threw the flashlight into the garage in a direction away from the officers in anger at their inaction," Plaintiffs' SOF ¶ 7; *see also* Defendants' Response SOF ¶ 7 ("Undisputed."), and then declared: "[S]crew it. I'm wasting my time, I'm going to bed, [i]t's 10:30." Joint SOF ¶ 10. Raymond told the Officer Defendants to "[g]et out of my garage" and asked Randall to "close the garage door" once the Officers had left. *Id.* ¶ 12. According to Randall, Raymond and the Officer Defendants "were all 'aggravated[.]'" *Ibid*.

At this point, the parties' stories begin to diverge. Although everyone agrees that Officer Paul entered the garage and "took Raymond down," the circumstances of this takedown are hotly contested. Joint SOF ¶ 13. The Defendants insist that, before the takedown, Raymond "came out of the house [a second time] and said, 'Next time they come, I'm gonna start shooting.'" Defendants' SOF ¶ 23; Plaintiffs' Response SOF ¶ 23 ("Disputed as to ¶ 23."). Officer Paul, concerned by these comments, "wanted to stop Raymond before anything further could happen as everything escalated

_____

at 117:17–19 ("Q: Did you call the police? A: Yeah, but we didn't figure on having the same two guys come out.").

5

quickly[.]" *Ibid.*; *see also* Defendants' Response SOF ¶ 10 ("Because of the statements made by Raymond, the Officers' knowledge from earlier in the day that Raymond had firearms and other weapons in the residence and in the vehicles, Raymond's 'storming back and forth,' and Raymond's move toward the residence, the Officers 'decided it would be in the best interest of everyone there to detain [Raymond] to prevent anything from happening.'"). Raymond, of course, denies making this statement and says that Officer Paul immediately took him to the ground when he tried to go back into the house to go to bed. *See* Plaintiffs' Response SOF ¶ 23 ("Raymond never came out of the house and said, 'Next time they come, I'm gonna start shooting.' He never made it inside the home before he was attacked.").

After he was taken to the ground by Officer Paul, Raymond admits that he "resisted the attempted detention but did not offer any violence to Officers Paul or Pohorence." Plaintiffs' SOF ¶ 12; *see also* Defendants' Response SOF ¶ 12 ("Undisputed[.]"). "As the Officers were attempting to detain Raymond, Randall came from the right side of the garage to the left, four to five feet inside the garage and approached the Officers." Joint SOF ¶ 15. Randall came within "a couple of feet" of where Raymond and the Officers were "and was yelling in fear, 'you are hurting my brother,' and 'this is unnecessary.'" *Ibid.*

Once again, the parties dispute how this secondary interaction between Randall and the Officer Defendants went down. The Defendants paint Randall as the instigator: Randall, they say, "'ran towards' Officer Pohorence 'in an aggressive manner,' approached within an arm's reach of him and said, 'Don't touch my brother.'" Defendants' SOF ¶ 35; *see also* Plaintiffs' Response SOF ¶ 35 ("Disputed as to ¶ 35."). Officer Pohorence then "pushed [Randall] with an open palm to his chest to create distance so the Officers could attempt to detain Raymond." Defendants' SOF ¶ 35. This push caused Randall to "[fall] back" and "trip[ ] on a chair to the ground[.]" *Ibid.* By contrast, the Plaintiffs say that Officer Pohorence "grabbed Randall's left arm and 'slung' him out of the garage, causing

[Randall] to lose his balance and fall, ending up on the ground in the driveway, between the truck and the PT Crusier." Joint SOF ¶ 16. Randall also alleges that Officer Pohorence "punched him in the face" and "stomped on the side of his head and stood on it for 10 to 15 seconds." Plaintiffs' SOF ¶ 18; *see also* Defendants' Response SOF ¶ 18 ("Disputed as to Randall's account regarding Pohorence's actions.").

During this fracas, Raymond "eluded [Officer] Paul, exited the garage, and ran toward his vehicle." Plaintiffs' SOF ¶ 17; *see also* Defendants' Response SOF ¶ 17 ("Undisputed."). Officer Paul "tackled Raymond on the cement driveway because of concern there might be a weapon inside the car." *Ibid.* The Defendants say that Officer Paul "struck Raymond with a closed fist to his head area in an attempt to detain him while giving loud verbal commands to place his arms behind his back." Defendants' SOF ¶ 38; *see also* Plaintiffs' Response SOF ¶ 38 ("Disputed as to ¶ 38."). Officer Paul also recounts that Randall "grabbed onto Officer Paul's right arm leaving his gun vulnerable while . . . shouting 'get off my brother.'" Defendants' SOF ¶ 38; *see also* Plaintiffs' Response SOF ¶ 38 ("Randall did not grab Paul. Randall was pushed, punched, and held down under Pohorence's boots, and arrested."). The Plaintiffs respond that Officer Paul "kept kneeing Raymond in the back," and that Raymond was struck so hard in the face that "his temporary teeth fell out." Joint SOF ¶ 13. Officer Paul purportedly taunted Raymond by asking: "How do you like my black ass attitude now?" Plaintiffs' Response SOF ¶ 26.[6] Eventually, Raymond "snapped his teeth back into place," said "Fine. Fuck it You can do what you want to with me. I'm done," and allowed the Officers to handcuff him. Joint SOF ¶ 14.

---

[6] This comment was allegedly in response to a racial epithet Raymond had previously directed at Officer Paul—although Officer Paul concedes that he can't remember exactly what Raymond said to him. *See* Officer Paul Deposition Tr. ("Paul Depo.") [ECF No. 108-12] at 126:1–12 ("Q: Did Raymond ever curse at you or make any racist remarks toward you? A: Yes. Pertaining to my race. . . . Q: What racist remarks are you claiming that Raymond Purcell made against you? . . . A: I don't remember. But I know my race was brought up during our encounter.").

Once both Purcell brothers were detained, the Officers arrested Randall for "resisting [an officer] with and without violence," whereas Raymond was "released on-scene with a Notice to Appear for resisting without violence[.]" Joint SOF ¶ 18. Randall was charged by the State Attorney's Office "for resisting without violence." *Id.* ¶ 19. Although Raymond doesn't remember if the State Attorney "filed charges" against him, *ibid.*, we take judicial notice of the records of the Broward County Court, which indicate that Raymond was also charged with resisting without violence, *see City of Ft. Lauderdale v. Purcell*, No. 17-003757MO10A (Fla. Broward Cnty. Ct. Apr. 25, 2017).[7] In any event, "[a]ll charges against both brothers were ultimately dismissed." Joint SOF ¶ 19.

## II.    The Internal Affairs Investigation

The Fort Lauderdale Police Department "maintains an Office of Internal Affairs to receive and investigate citizen complaints." *Id.* ¶ 22. The Department has promulgated "Policy 119.1" and "Policy 119.3." *Id.* ¶¶ 23–24. The purpose of the former "is to establish and maintain guidelines" for the use of force in "response to resistance of any nature whatsoever," Policy 119.1 [ECF No. 108-19] at 1, whereas the latter "sets forth the guidelines for the reporting, evaluation and investigation of all responses to resistance by all Fort Lauderdale department members," Policy 119.3 [ECF No. 108-18] at 1. If a member of the public complains that a Fort Lauderdale police officer violated these policies, "an officer holding the rank of Sergeant or higher will engage in fact-finding by conducting necessary interviews and reviewing relevant documentation concerning the event at issue." Joint SOF ¶ 26.

---

[7] Federal Rule of Evidence 201 allows us to take judicial notice of court records since they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 652 (11th Cir. 2020) (quoting FED. R. EVID. 201(b)); *see also Cave v. Stone*, 2021 WL 4427451, at *1 (S.D. Fla. Sept. 27, 2021) (Altman, J.) ("Federal Rule of Evidence 201 permits a federal court to take judicial notice of state-court records because, generally, those records 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting FED. R. EVID. 201(b))); *Sullenberger v. City of Coral Gables*, 2024 WL 262530, at *2 n.7 (S.D. Fla. Jan. 24, 2024) (Altman, J.) (same).

A complaint can "be closed without charges and an investigation" in three circumstances: "1) If the complaint is withdrawn; 2) If 'an anonymous complaint is received that cannot in any way be substantiated or investigated without further information; or 3) If 'sufficient information with corroborating documentation exists to dispute the validity of the complaint.'" Plaintiffs' SOF ¶ 31 (quoting Internal Affairs Standard Operating Procedure ("IA SOP") [ECF No. 108-21] at 4)); *see also* Defendants' Response SOF ¶ 31 ("Undisputed that those are the exceptions[.]"). Assuming none of these three exceptions apply, the investigating officer will prepare a written report "for assessment by the supervisor in the Office of Internal Affairs." Joint SOF ¶ 26. This Internal Affairs supervisor will issue a "written recommendation" for one of five possible findings: "sustain, not sustain, unfounded, policy failure or exonerated." IA SOP at 6. The recommendation will then be reviewed by "the appropriate Bureau Assistance Chief" and then presented to the Chief of Police "for review with discipline recommendations." *Ibid.*

On April 23, 2019, more than two years after his encounter with the Officer Defendants, Raymond Purcell "filed an IA complaint and gave a statement to IA . . . alleging excessive force, false statements, and false arrest by Paul and Pohorence." Joint SOF ¶ 83. To corroborate his allegations, Raymond "provided IA [with] Jackie Islam['s] and Randall's phone numbers as well as [the] best times to call." *Id.* ¶ 86. IA did not speak to either Jackie or Randall, nor did they "look into the allegations that [Officer] Pohorence used excessive force against Randall Purcell" or the Officer Defendants' alleged "failure to document Randall and Raymond's injuries." *Id.* ¶¶ 86, 89–90. IA "did not use a formal case file format for Raymond's complaint" and instead "resolved the case as a Note to File." *Id.* ¶ 87; *see also* Note to File [ECF No. 121-2]. The Note to File indicates that the investigator relied on the following information: (1) Raymond's April 30, 2019 "sworn statement," Note to File at 1; (2) the incident reports prepared by Officers Paul and Pohorence, *see id.* at 3; (3) the sworn statement of Sergeant Jeffrey Brull (an officer who "responded to the scene at the request of the officers and the

complainants"), *ibid.*; and (4) the depositions of Officer Paul and Officer Pohorence "taken by Attorney David Sobel—counsel for Mr. Raymond and Randall Purcell [during their criminal cases]," *id.* at 4. After considering this evidence, "IA closed the case . . . based on a finding of no apparent policy violation." Joint SOF ¶ 88. The Note to File did not indicate "that one of [the] three exceptions" justifying summary disposition of a citizen complaint applied. *Ibid.*

## THE LAW

### I.    The Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion [ ] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with 'specific facts showing there is a genuine issue for trial.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted)).

10

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). Where, as here, there are competing cross-motions for summary judgment, "the facts are viewed in the light most favorable to the non-moving party on each motion[.]" *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## II.     Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "To invoke the defense of qualified immunity, a government official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). If the government official was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Ibid.*

To qualify as clearly established, a legal principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021) (quoting *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020)). "Put another way, the defendant must have fair notice of his conduct's unconstitutionality which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (cleaned up). In our District, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *McClish v. Nugent*,

483 F.3d 1231, 1237 (11th Cir. 2007). "[A]t the summary judgment stage, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of the officer's actions . . . is a pure question of law." *Penley v. Eslinger*, 605 F.3d 843, 848–49 (11th Cir. 2010) (cleaned up). In sum, "the doctrine of qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mitchell v. Peoples*, 10 F.4th 1226, 1229 (11th Cir. 2021) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

### ANALYSIS

The Plaintiffs assert the following ten counts (the first six against the Officer Defendants and the final four against the City): (1) illegal entry into Raymond's home, in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983, *see* Complaint at 20; (2) unlawful seizure, in violation of the Fourth and Fourteenth Amendments and § 1983, *see id.* at 21; (3) excessive force, in violation of the Fourth and Fourteenth Amendments and § 1983, *see id.* at 23; (4) assault and battery, in violation of Florida law, *see id.* at 24; (5) false imprisonment, in violation of Florida law, *see id.* at 25; (6) malicious prosecution, in violation of Florida law, *see ibid.*; (7) "federal civil rights violations" (*viz.*, that the City's "*de facto* policies, practices, and/or customs" were the "moving force behind" the Officer Defendants' alleged constitutional violations), in violation of § 1983, *see id.* at 30; (8) vicarious liability for the Officer Defendants' assault and battery, in violation of Florida law; (9) vicarious liability for the Officer Defendants' false imprisonment, in violation of Florida law; and (10) negligent training and/or supervision, in violation of Florida law, *see id.* at 32.

Both parties have moved for summary judgment on different counts. The Defendants move for summary judgment on all counts *except* Count X. *See generally* Defendants MSJ.[8] The Plaintiffs, on

---

[8] Both parties' briefs conspicuously omit any discussion—even in passing—of Count X. *See generally* Defendants' MSJ; Plaintiffs' MSJ. We presume that the parties' silence is an admission that, as to Count X, neither party "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also United*

the other hand, only move for summary judgment on five "key legal issues" relating to "Counts II–V and VII–IX of the Complaint": (1) that the Officer Defendants lacked "reasonable suspicion to believe Raymond Purcell was engaged in any criminal conduct"; (2) that Raymond "was legally entitled to resist the unlawful seizure without violence" and that his resistance "did not trigger probable cause to arrest Raymond Purcell for resisting arrest without violence"; (3) that the force the Officer Defendants deployed, "including the force used against Randall Purcell as he lawfully and proportionally defended his brother," was "excessive"; (4) that the City had a "policy and practice of not following its established investigative requirements," which caused it to "persistently fail[ ] to investigate and discipline known instances of excessive force"; and (5) that the City's failures were "a moving force behind the constitutional law violations alleged in this case." Plaintiffs' MSJ at 1–2. We'll address the relevant arguments in turn.

## I.      The Claims Against the Officer Defendants (Counts I–VI)

### A.      Illegal Entry (Count I)

In Count I, the Plaintiffs allege that the Officer Defendants violated their constitutional rights by making a "warrantless and nonconsensual entry into their home." Complaint ¶ 91. The Officer Defendants admit that they entered Raymond's garage to detain him—but claim that they only did so after Raymond allegedly said: "Next time they come. I'm gonna start shooting." *See* Defendants' SOF ¶ 24 ("After hearing that statement, the Officers walked towards Raymond to detain him. Officer

---

*States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

Pohorence believe[d] the Officers had exigent circumstances to enter the garage at that point.").[9] The Officer Defendants argue that they're entitled to qualified immunity on Count I because "the Officers could have reasonably believed that Raymond was going inside the home to retrieve his gun, a deadly weapon." Defendants' MSJ at 10. The Defendants thus contend that the Officers were presented with an exigent circumstance, which permitted them to enter Raymond's home without a warrant. *See id.* at 7 (arguing that "a reasonable belief that the suspect is armed" and "a likelihood that delay could . . . jeopardize the safety of officers or the public" are "exigent circumstances justifying a warrantless entry" (citing *United States v. Joseph*, 700 F. App'x 918, 920 (11th Cir. 2017))).

"Under the Fourth Amendment, the home is a sacrosanct place that enjoys special protection from government intrusion. The government may not enter a person's home to effect a warrantless arrest without probable cause and either consent or exigent circumstances." *Moore v. Pederson*, 806 F.3d 1036, 1039 (11th Cir. 2015). The law is clearly established in our Circuit that "an officer who, without a warrant, or probable cause along with exigent circumstances or consent, 'reache[s] into [a] house, grab[s] [him], and forcibly pull[s] him out onto the porch' in order to arrest him, violate[s] the plaintiff's Fourth Amendment rights." *Id.* at 1043–44 (cleaned up) (quoting *McClish v. Nugent*, 483 F.3d 1231, 1235–36 (11th Cir. 2007)).[10] The Defendants claim that "the Officers could have reasonably believed that Raymond was going inside the home to retrieve his gun, a deadly weapon." Defendants' MSJ at

---

[9] A garage that's "attached to the home itself" and has an "outside door" that can be "closed to maintain privacy" is a part of the home for Fourth Amendment purposes. *Coffin v. Brandau*, 642 F.3d 999, 1012 (11th Cir. 2011) (en banc).

[10] To prevail on *any* claim under § 1983, the Plaintiffs "must demonstrate both (1) that the defendant deprived [them] of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law." *Arrington v. Cobb Cnty.*, 139 F.3d 865, 872 (11th Cir. 1998). Since no one disputes that the Officer Defendants were acting under color of state law during the events of April 6, 2017, only the first element of a § 1983 offense (whether the Officer Defendants deprived the Plaintiffs of their clearly established constitutional rights) is at issue here. *See Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1268 (11th Cir. 2012) ("A § 1983 defendant who abuses the power and authority given to her by the state acts under color of state law. . . . As we have recently had occasion to reiterate, an act is effected under color of law if it is effected by a law enforcement officer acting under pretense of law." (cleaned up)).

10. And (they continue) they're entitled to qualified immunity because "[a] reasonable officer in the Officers' position could have reasonably, even if mistakenly, believed that violence was imminent." *Ibid.*

The parties agree that the Officer Defendants were "acting within the scope of [their] discretionary authority when the allegedly wrongful acts occurred." *Spencer*, 5 F.4th at 1230; *see also* Defendants' MSJ at 6 ("Here it cannot be disputed that the Officers acted within their discretionary authority as police officers in investigating a reported crime of vandalism. . . . Indeed, Plaintiffs allege that at all material times, the Officers were duly authorized agents of the City, acting under color of law within the course and scope of their duties as police officers[.]"); *see generally* Response to Defendants' MSJ (failing to contest this point). So, our focus here (as for the other counts in which the Officer Defendants assert the defense of qualified immunity) is on whether the Officer Defendants' "conduct (1) violated federal law (2) that was clearly established at the relevant time." *Spencer*, 5 F.4th at 1230. Ultimately, we think the Plaintiffs have done just enough to get this claim to a jury.

The Supreme Court has made clear that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002); *see also Hardigree v. Lofton*, 992 F.3d 1216, 1229 (11th Cir. 2021) ("It was clearly established long before Lofton arrived at Hardigree's door that without a warrant or consent, or probable cause and exigent circumstances, he could not enter the home."). But the Eleventh Circuit (and many of its sister circuits) have clarified that the "probable cause element may be satisfied where officers reasonably believe a person is in danger." *United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002); *see also, e.g.*, *Lowther v. Child. Youth & Fam. Dep't*, 101 F.4th 742, 760 (10th Cir. 2024) ("[An] exigency exists when officials have objectively reasonable grounds to believe that there is an immediate need to protect their lives or others. Under these circumstances, officials do not need probable cause."

(cleaned up)); *United States v. Quarterman*, 877 F.3d 794, 800 (8th Cir. 2017) ("If officers have an objectively reasonable basis that some immediate act is required to preserve the safety of others or themselves, they do not also need probable cause [to make a warrantless entry]." (citing *Michigan v. Fisher*, 558 U.S. 45, 47 (2009))).

On this issue, we find instructive the Supreme Court's decision in *Ryburn v. Huff*, 565 U.S. 469 (2012). In that case, law enforcement officers were investigating the credibility of a threat made by a high school student who had "written a letter threatening to 'shoot up' the school." *Id.* at 470. The officers arrived at the student's house where, after initially refusing to "respond to [the officers'] knocks," the student and his mother "walked out of the house and stood on the front steps." *Id.* at 471. When the student's mother "refused" the officers' "request to continue the discussion inside," one of the officers asked "her if there were any guns in the house." *Ibid.* At that point, the mother responded by "immediately turning around and running into the house," which prompted two of the officers to follow her because they were "scared [and] didn't know what was in that house" and had "seen too many officers killed[.]" *Ibid.* (cleaned up). The officers "remained inside the house for a total of 5 to 10 minutes" but did not "conduct a search of [the occupants] or any of their property." *Id.* at 472. The Supreme Court held, based on these facts, that the officers were entitled to qualified immunity because "[a] reasonable police officer could read [prior Supreme Court decisions] to mean that the Fourth Amendment permits an officer to enter a residence if the officer *has a reasonable basis for concluding that there is an imminent threat of violence.*" *Id.* at 474 (emphasis added) (first citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); and then citing *Georgia v. Randolph*, 547 U.S. 103, 118 (2006)).

We therefore agree that our Officer Defendants *could* enter Raymond's home without probable cause *if* they "reasonably believe[d]" that Raymond's conduct presented "an imminent threat of violence." *Ibid.*; *see also Brigham City*, 547 U.S. at 403 ("The need to protect or preserve life or avoid

serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978))).

Viewing our facts in the light most favorable to the Plaintiffs, however, we think a reasonable jury *could* conclude that the objective facts do *not* similarly support the Officers' entry into the Purcells' garage. Officer Paul (it's true) testified that he knew Raymond had "weapons in the house" (which included a firearm and "weapons on the wall"), Paul Depo. at 119:4–6, 14–15, and that he was concerned about Raymond "throwing things around" and "acting crazy in the garage," *id.* at 155:17–22. But *both Officers* testified that they only decided to enter the garage when Raymond came *back out of the house* and threatened to shoot. *See id.* at 155:12–25 ("[Raymond] threw the flashlight, went inside the house. . . . While interacting with [Jackie], [Raymond] *comes back around again*, enters into the garage from the front door, starts throwing things around, and says, if they come back I'm shooting. *At that point*, . . . I felt detaining him was necessary." (emphases added)); *see also* Officer Pohorence Deposition ("Pohorence Depo.") [ECF No. 108-11] at 92:10–14 ("Q: All right. And when [Raymond] made that statement ['Next time they come back, I'm gonna start shooting'], it's your testimony that Officer Paul and you decided he should be detained, is that correct? A: Correct."). And, if we were to take the facts in the light most favorable to the Officers, they'd be right: Raymond's conduct (and comment) *may have* justified their entry into his home. *See, e.g.*, *Fisher v. City of San Jose*, 558 F.3d 1069, 1078 (9th Cir. 2009) (holding that Fisher's "threat[ ] to shoot [the police]" was an exigency that permitted a warrantless entry and arrest).

At summary judgment, however, we must accept the *non-movant's* version of the facts. *See Pennington*, 261 F.3d at 1265. And, according to the Plaintiffs, Raymond made no such verbal threats. *See* Plaintiffs' SOF ¶ 8 ("Raymond denies saying ['Next time they come, I'm gonna start shooting.']"); *see also* Raymond Depo. at 133:20–24 ("Q: When the white officer, Pohorence, said [the damage to the vehicles is] a hundred bucks, your response was I'm just going to file a report and go to bed? A: I

said, screw it. I'm wasting my time. I'm going to bed. It's 10:30.")." In fact, Raymond insists that he *couldn't* have come out a second time—and thus couldn't have made the comment about shooting the officers—because the Officer Defendants "beat the crap out of me" when he *first* announced he was going to bed. Raymond Depo. at 137:13; *see also id.* at 136:24–25, 137:1–2 ("[Q:] So when you told [the Officer Defendants] I'm going to bed, what did you do? A: Walked towards the garage door and got the crap beat out of me."). Plus, Raymond had made clear to the Officer Defendants that his gun was *in the car*—not the house. *See* Defendants' SOF ¶ 5 ("[Officer Paul] asked Raymond if there were any weapons in the house . . . Raymond became 'offended' and 'agitated' when asked . . . but advised there may be a pistol in the car[.]"); *see also* Plaintiffs' Response SOF ¶ 5 ("Disputed as to ¶ 5. Raymond calmly informed Paul that he had a firearm and it was in his car."). Since we must accept Raymond's version of the facts at this stage of the litigation, we cannot agree that the Officer Defendants had "a reasonable basis for concluding that there [wa]s an imminent threat of violence." *Ryburn*, 565 U.S. at 474.

Still resisting, the Officer Defendants insist that, "[e]ven without the [threatening] statements, however, the situation was escalating based on Raymond's other words and actions and readily accessible weapons, and the Officers made a split-second determination that it was necessary to detain Raymond for the Officers' safety as well as Raymond's." Defendants' MSJ at 10. But, taking the Plaintiffs' facts as true—which means ignoring Raymond's threat to shoot—there was nothing in Raymond's interactions with the Officer Defendants that would have led a reasonable officer to "conclud[e] that there is an imminent threat of violence." *Ryburn*, 565 U.S. at 474. It's true that Raymond owned a gun, but everyone agrees that Raymond, who was walking back into *his house*, told the Officer Defendants the gun was *in the car*—not the house. *See* Defendants' SOF ¶ 5; Plaintiffs' Response SOF ¶ 5. In any event, the law is well-settled that "[t]he presence of a weapon in a home does not necessarily constitute exigent circumstances." *Quarterman*, 877 F.3d at 798 (citing *United States*

*v. Murphy*, 69 F.3d 237, 243 (8th Cir. 1995)); *see also United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (same); *cf. Heller v. Dist. of Columbia*, 554 U.S. 570, 595 (2008) ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms [in the home]."). And we've found no case—nor have the Defendants cited to one— in which the police can enter a citizen's home simply because he's expressed frustration with the officers and decided to go to bed. Since the Plaintiffs' version of the facts created *no* basis—let alone a reasonable basis—for "concluding that there [wa]s an imminent threat of violence," *Ryburn*, 565 U.S. at 474, our Officer Defendants aren't entitled to qualified immunity here.[11]

Unlike the plaintiff in *Ryburn*, whose son was believed to be planning a mass shooting and who suddenly "turn[ed] around and [ran] into the house" when asked "if there were any guns in the house," *id.* at 471, Raymond (on his version of the facts) simply told the Officers that he was going to bed. *Cf. Martin v. Coyt*, 2012 WL 4343749, at *11 (W.D. Ky. Sept. 21, 2012) ("Unlike the *Ryburn* mother's bizarre flight into the house when asked if there were guns inside, the facts here suggest John merely reentered the house to terminate the encounter with Brian. Therefore, considering the totality of the circumstances, it is incorrect to say that *Ryburn* would justify summary judgment.").

We therefore **DENY** the Defendants' motion for summary judgment on Count I.

---

[11] In their MSJ Reply, the Defendants for the first time suggest that the Officer Defendants *might* not have entered the home illegally because they "were already in the garage when they initiated the attempt to detain Raymond." Reply to Defendants' MSJ at 3. We reject this argument for three reasons. *One*, we won't consider new arguments a party raises for the first time in a reply brief. *See In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). *Two*, Raymond disagrees that the Officer Defendants entered his garage before they tackled and detained him. *See* Raymond Depo. at 128:14–19 ("[Q:] So when the police were inspecting the damage did they ever enter inside the garage? . . . A: No."). *Three*, even if the Officer Defendants *had* entered the garage with Raymond's implied consent, Raymond very likely revoked that consent when he, before the seizure, told the Officers "to leave" and to "get off my property." Randall Depo. at 78:14–15; *see also United States v. Holmes*, 143 F. Supp. 3d 1252, 1262 (M.D. Fla. 2015) (Corrigan, J.) ("[T]the Eleventh Circuit stated that the implied license to enter private property . . . may be revoked by 'express orders from the person in possession.'" (quoting *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006))).

### B.      Unlawful Seizure (Count II)

In Count II, the Plaintiffs allege that the Officer Defendants seized both Raymond and Randall without "probable cause to believe plaintiffs committed any criminal offense or reasonable suspicion to believe they had committed an offense, were committing an offense, or were about to commit an offense." Complaint ¶ 99. Both parties move for summary judgment on Count II as to Raymond's seizure.[12] The Officer Defendants argue that they were constitutionally permitted to "detain Raymond for the 'weighty' reason of officer safety, particularly in light of Raymond's expressed anger and the Officers' understanding that Raymond had weapons, including firearms, in his house." Defendants' MSJ at 11. The Plaintiffs counter that "there could be no legal Fourth Amendment detention for officer safety in the absence of . . . reasonable suspicion of criminal conduct," Plaintiffs' MSJ at 6, and that Raymond's resistance to this initial, illegal seizure did not subsequently give the Officer Defendants probable cause to arrest Raymond because "every person has the right to resist, without violence, an unlawful arrest," *id.* at 10 (quoting *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1410 (S.D. Fla. 2014) (Hurley, J.)). Since the facts surrounding Raymond's seizure are hotly contested, we cannot grant either party's request for summary judgment on Count II.

The Fourth Amendment "protects people from unreasonable . . . seizures." *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) (citing U.S. CONST. amend. IV). A seizure "occurs when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]'" *Ibid.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). An "interaction between law enforcement and an individual" doesn't constitute a seizure unless "the police . . . exert a show of authority that

---

[12] The parties appear to concede—since they don't brief the issue at all—that summary judgment would be inappropriate on Count II as to Randall. *See generally* Defendants' MSJ; Plaintiffs' MSJ. We'll therefore presume that the parties' silence is an admission that, on that claim, neither party "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances.").

communicates to the individual that his liberty is restrained, meaning he is not free to leave." *United States v. Baker*, 290 F.3d 1276, 1278 (11th Cir. 2002); *see also United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (explaining that a seizure occurs when "a reasonable person would not feel free to terminate the encounter"). Officers, in sum, may constitutionally seize a person "as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Michigan v. Long*, 463 U.S. 1032, 1051 (1983).

The parties agree that police officers may lawfully seize a suspect in at least two circumstances: *one*, during a *Terry* stop, when an officer "has a reasonable suspicion supported by articulable facts that criminal activity may be afoot," *United States v. Bishop*, 940 F.3d 1242, 1248 (11th Cir. 2019) (cleaned up); and *two*, during an arrest justified "by the presence of probable cause," *Carter v. Butts Cnty., Ga.*, 821 F.3d 1310, 1319 (11th Cir. 2016). But the Defendants go one step further, saying that "it is immaterial whether the Officers had probable cause or reasonable suspicion to believe that Raymond had committed, was in the process of committing, or was about to commit a crime." Defendants' MSJ at 11. Relying on *United States v. Lewis*, 674 F.3d 1298 (11th Cir. 2012), the Defendants offer a third scenario in which (they say) officers may detain a suspect even *without* "any particularized reasonable suspicion"—and that's for "reasons of safety[.]" *Ibid.* (citing *Lewis*, 674 F.3d at 1306).

We don't agree with this interpretation of *Lewis*. Although the Eleventh Circuit held that a police officer can detain persons "for safety reasons" and without "individualized reasonable suspicion of criminal activity," it emphasized that this exception only applies "in the course of conducting a valid *Terry* stop as to *other* related individuals." *Lewis*, 674 F.3d at 1306 (emphasis added); *see also United States v. Clark*, 337 F.3d 1282, 1288 (11th Cir. 2003) ("[T]his court reasoned that an officer may 'control' persons not suspected of wrongdoing if they are near a street encounter with persons reasonably suspected of criminal activity." (citing *Hudson v. Hall*, 231 F.3d 1289, 1297 (11th Cir. 2003))); *United States v. Arbery*, 591 F. App'x 749, 752 (11th Cir. 2014) ("Under these circumstances, it

was reasonable for Officer Melendez to briefly assert control over Arbery, whom he believed was one of [the arrestee's] associates, for safety reasons by ordering Arbery to lay down on the ground and then frisking Arbery for weapons on the outside of his pants."). Nothing in *Lewis* suggests, however, that an officer can, without reasonable suspicion, seize a suspect for "safety reasons" *outside* this limited context. And the Supreme Court's seizure jurisprudence strongly belies the Officers' contention that *Lewis* created any such special exception. *See Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) ("[T]he Fourth Amendment requires at least a minimal level of objective justification for making the [seizure]. The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." (cleaned up)); *see also United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987) ("[A search and seizure] requires an objectively reasonable fear based upon specific facts regarding specific individuals. A generalized suspicion or 'hunch' will not justify a [seizure]."); *cf. United States v. Flippin*, 924 F.2d 163, 165 (9th Cir. 1991) (affirming seizure where the police had "*reasonable suspicion* that the suspect was arming herself" (emphasis added)).

At any rate, our facts—when viewed in the light most favorable to the Plaintiffs—don't support the Defendants' safety concerns. As we discussed when we denied the Defendants' MSJ on Count I, Raymond said that he was going to bed and, despite being "aggravated," doesn't appear to have posed any imminent threat to the Officers—especially because everyone agrees that Raymond told the Officers his gun was in the car, not the house. *See ante*, at 18–20; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" (quoting *Terry*, 392 U.S. at 27)); *cf. United States v. Showers*, 2020 WL 1545702, at *6 (E.D. Mich. Apr. 1, 2020) (finding that "it was plausible that a probation officer would conclude that Defendant might arm himself" because he had previously been "found with a concealed weapon" and was involved in "a second shooting having occurred thirteen days prior"). We therefore **DENY** the Defendants' request for summary judgment on Count II.

On the other hand, we won't grant Raymond's motion for summary judgment on Count II either. In the Plaintiffs' view, the Officer Defendants "ha[ve] consistently conceded [they] had no reasonable suspicion to believe Raymond Purcell was engaged in criminal conduct when he initiated the detention of Raymond Purcell." Plaintiffs' MSJ at 8. Because (the Plaintiffs continue) the Officers admit that they seized Raymond without probable cause or reasonable suspicion, we must find the seizure illegal as a matter of law. *See id.* at 9 ("Given the admission that law enforcement was not initiating a *Terry* investigatory stop and did not have a well-found belief of reasonable suspicion, there are no triable issues of facts for the jury to resolve."). For this argument, the Plaintiffs rely on the deposition testimony of the Officer Defendants, who (according to the Plaintiffs) admitted that they lacked either probable cause or reasonable suspicion to detain Raymond. *See, e.g.*, Paul Depo. at 97:11–19 ("Q: You did not believe that Raymond Purcell was in the process of committing a crime? A: No. All I know he said a comment [sic], wants to run inside of his house, where there are weapons inside or bombs inside his house. Q: You did not detain Raymond Purcell under what we call a *Terry* Stop, correct? . . . A: Right."); Officer Pohorence Criminal Deposition [ECF No. 108-7] at 16:23–17:12 ("[Q:] Did you believe a crime had previously been committed by [Raymond]? A: Not by him, but he was the victim of a crime. . . . Q: So you did not believe he previously committed a crime, had committed a crime, or [was] about to commit a crime, right? A: No. Q: Okay. Did you have probable cause for an arrest? A: On him, no.").

But we needn't accept a party's legal opinion about his or her own actions—especially when that opinion contradicts other things the party said in his deposition. *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness also may not testify to the legal implications of conduct[.]"); *see also Romano v. John Hancock Life Ins. Co.*, 2022 WL 1447733, at *1 (S.D. Fla. May 9, 2022) (Goodman, Mag. J.) ("On questions of the law, the fact finder does not look to the parties, the lawyers, or the witnesses for the answers; she looks to only the Court."). Police officers aren't

lawyers—let alone judges—and their legal opinions on often-complicated constitutional issues aren't binding on us. *See, e.g.*, *United States v. Sutton*, 642 F. Supp. 3d 57, 73 (D.D.C. 2022) (excluding former police officers from offering "an opinion about whether Mr. Sutton had sufficient grounds to conduct a *Terry* stop").

The fact is that, when we take *all the evidence* in the light most favorable to the Defendants—as we must when reviewing the Purcells' motion—Raymond threatened to shoot the Officer Defendants, *see* Paul Depo. at 152:2–4 ("I tried to detain [Raymond] because he came back out saying, you know, come back I'ma start—I'ma start shooting[.]"); Pohorence Depo. at 40:23–25 ("[Raymond] made the statement, 'Next time they come, I'm gonna shoot, or I'm gonna start shooting.'"), *and* the Officers knew that he owned a firearm with which he might make good on that threat, *see* Paul Depo. at 155:20–25 ("At that point knowing that—with the prior knowledge of him having firearms in the house, and him acting crazy in the garage . . . I felt that detaining him was needed."). Raymond (it's true) had told the Officers that the firearm was in the car. *See* Defendants' SOF ¶ 5; Plaintiffs' Response SOF ¶ 5. But Officer Paul also testified that Raymond's girlfriend (Jackie Islam) "said there's a firearm in the car *and in the house as well*, too." Paul Depo. at 119:25–120:2; *see also id.* at 118:23–119:6 ("Q: So, it's your testimony that Raymond Purcell told you that there were firearms in the house as well as the car? A: Yes, on my first call. . . . The first call, [Raymond], . . . kind of boasted about the firearms he had inside the residence as well as in the car as well. So, I had prior knowledge of weapons in the house."). On the Officers' version of the facts, then, Raymond's aggravation, his access to firearms, and his threat to shoot gave the Officer Defendants reasonable suspicion to seize him. *See United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989) ("The handcuffing of Hastamorir constituted a *Terry* stop, and was a reasonable action . . . [since] the agents reasonably believed that the men presented a potential threat to their safety."); *United States v. Elston*, 479 F.3d 314, 319 (4th Cir. 2007) (approving *Terry* stop of "an individual who had expressly threatened to shoot someone in the very near future");

*see also, e.g.*, *United States v. Foster*, 2018 WL 4374239, at *8 (M.D. Ala. July 13, 2018) ("It is well settled within this Circuit that during a *Terry* stop, an officer may detain a suspect if there is a concern for officer safety[.]").[13] We therefore **DENY** both parties' motions for summary judgment on Count II.

### C.    Excessive Force (Count III)

In Count III, the Plaintiffs allege that the Officer Defendants' "use of force in effectuating the detention of Raymond and Randall Purcell was excessive" and, therefore, unconstitutional. Complaint ¶ 111. Unlike what we saw with Count II, the parties request summary judgment on different aspects of Count III. The Defendants contend that they're entitled to summary judgment on a very narrow issue: The Plaintiffs (they say) failed to produce any evidence that "Officer Pohorence used excessive force against [Raymond]." Defendants' MSJ at 12. But they don't contest Count III as it relates to Officer Paul's (alleged) use of excessive force against Raymond or the Officer Defendants' collective use of force against Randall. The Plaintiffs, by contrast, move for summary judgment on *all* of Count III for two reasons. *First*, as to Raymond, the Plaintiffs argue that, since his seizure was unlawful, "all force used against [him] was excessive[.]" Plaintiffs' MSJ at 12. *Second*, as to Randall, the Plaintiffs say that the Officers' force was unjustified because (1) Randall "did not interfere with the arrest [of Raymond]," and (2) "law enforcement was not executing a lawful seizure[.]" *Id.* at 14.

An excessive-force claim "arising out of an arrest . . . is governed by the Fourth Amendment's 'objective reasonableness' standard." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)). The Eleventh Circuit has recognized two types of excessive-force claims: "genuine" claims and "artificial" claims. A "genuine" claim focuses on

---

[13] Since Raymond's threat provided the Officer Defendants with a legal basis to seize him, we reject Raymond's argument that he was legally entitled to resist this seizure. *See Harris v. Wingo*, 845 F. App'x 892, 896 (11th Cir. 2021) ("To support a conviction for [resisting an officer without violence], the State must prove . . . [that] the officer was engaged in the *lawful execution* of a legal duty[.]" (emphasis added) (quoting *C.E.L. v. State*, 24 So. 3d 1181, 1185–86 (Fla. 2009))). And, because Raymond resisted a lawful seizure, the Officer Defendants had probable cause to arrest him for resisting without violence. *See ibid.*

"whether an officer's use of force was objectively reasonable" and is "independent of whether law enforcement had the power to arrest." *Ibid.* The reasonableness of an officer's use of force turns on whether it was "reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer or others, and the risk of flight. [We] also consider[ ] the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted by the arresting officer." *Ingram v. Kubik*, 30 F.4th 1241, 1251 (11th Cir. 2022) (first quoting *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002); and then quoting *Helm v. Rainbow City, Ala.*, 989 F.3d 1265, 1273 (11th Cir. 2022) (cleaned up)).

By contrast, "an artificial excessive force claim" contends that the "force was excessive merely because another Fourth Amendment violation occurred[.]" *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022). In these cases, the excessive-force claim merges with the *other* Fourth Amendment violation because "a plaintiff cannot double recover . . . when the absence of probable cause is the only thing that makes an officer's use of force unreasonable." *Id.* at 1180–81; *see also Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) ("[A] claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim."). As this summation makes plain, both Plaintiffs are asserting "artificial" excessive-force claims. Both, after all, argue that the Defendants' use of force was excessive simply because the Officers lacked reasonable suspicion to seize the Plaintiffs in the first place. *See* Plaintiffs' MSJ at 12–13 ("Applied here, all force used against Raymond Purcell was excessive because there was no reasonable suspicion of criminal conduct to detain Raymond Purcell and there was no probable cause to arrest Raymond Purcell for resisting his unlawful seizure without violence. . . . Count III's excessive force claim [as to Raymond] should be merged into Count II[.]"); *id.* at 15 ("Randall Purcell was well within his legal rights to take reasonable steps to stop unconstitutional, excessive force taking place at his home.").

27

We'll turn first to the Defendants' motion. The Defendants believe "there is no evidence . . . that Officer Pohorence assaulted or battered Raymond or used excessive force against him[.]" Defendants' MSJ at 12; *see also* Raymond Depo. at 160:25–61:3 ("Q: Are you able to offer us any testimony here today about anything that Officer Pohorence, the white officer, did to you? A: Don't know."). But, as the Plaintiffs note, Randall specifically testified that Pohorence used force against Raymond. *See* Randall Depo. at 95:5–7 ("[T]he big tall cop [Pohorence] had [Raymond's] other shoulder twisting it and yanking it upward in a way that I didn't know a body could be twisted."). Since we must accept Randall's testimony at this stage of the case, we find that the Plaintiffs have created a genuine issue of material fact as to whether Officer Pohorence used force against Raymond. And, under the Plaintiffs' version of the facts, Officer Pohorence "[did] not have the right to use any degree or force," *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006), against Raymond because he had no right to seize him in the first place, *see* Plaintiffs' MSJ at 12 ("[A]ll force used against Raymond Purcell was excessive because there was no reasonable suspicion of criminal conduct to detain Raymond Purcell[.]").[14] We therefore **DENY** the Defendants' MSJ on Count III.

The Plaintiffs' summary-judgment arguments fare no better. Raymond, for instance, asks for summary judgment on Count III because (he believes) he's entitled to summary judgment on Count II (his illegal-seizure claim). *See* Plaintiffs' MSJ at 12 ("Applied here, all force used against Raymond Purcell was excessive because there was no reasonable suspicion of criminal conduct to detain Raymond Purcell and there was no probable cause to arrest Raymond Purcell for resisting his unlawful seizure without violence."). But we've already found that Raymond *isn't* entitled to summary judgment

---

[14] In their Reply, the Defendants argue that Officer Pohorence was "allowed to use various physical maneuvers to gain compliance in response to a person actively or passively resisting[.]" Reply to Defendants' MSJ at 9. But this argument presupposes that the Officers had a legal basis to seize Raymond in the first place. *See Jackson*, 206 F.3d at 1171 ("[B]ecause if a stop or arrest is illegal, then there is no basis for any threat or any use of force, and an excessive force claim would always arise but only collaterally from the illegal stop or arrest claim.").

on Count II because the facts—viewed in the light most favorable to the Defendants—suggest that the Officers *had* reasonable suspicion to seize him. *See ante*, at 24–25. If the Officer Defendants lawfully seized Raymond—and since Raymond offers no *separate* argument that the Officers' use of force was, separate and apart from the seizure, excessive—we **DENY** his motion for summary judgment on Count III. *Cf. Smith v. Mattox*, 127 F.3d 1416, 1418–19 (11th Cir. 1997) ("Smith's failure to claim a violation of his Fourth Amendment rights by warrantless search or arrest without probable cause precludes consideration of his excessive-force claim as part of such a Fourth Amendment claim.").

Randall's request for summary judgment likewise fails. His excessive-force claim, remember, arises from two separate incidents. In the first, Officer Pohorence "pushed Randall with an open palm." Plaintiffs' MSJ at 13. Here, however, Officer Pohorence says that, while he and Officer Paul were trying to detain Raymond, Randall approached the Officers and told them "don't touch my brother[.]" Pohorence Depo. at 95:25; *see also* Randall Depo. at 95:16–21 ("I stopped at least two to three feet from the officers or three-and-a-half to four yelling at them, this is unnecessary. You are hurting my brother. He has had surgery on his shoulder, his back. You are hurting him. You are hurting him. This is not necessary."). As Randall "proceeded to advance," Officer Pohorence drew his taser and "told him to stay back." Pohorence Depo. at 96:1–4. When Randall didn't stop—and as Randall came within "arms reach"—Officer Pohorence "pushed [Randall] with an open palm," causing Randall to "[fall] to the ground" and "stumble[ ] away from the garage." *Id.* at 77:17–19, 96:6–10. The second use of force came shortly after—when, after Raymond escaped his grasp, Officer Paul "ran as fast as he could towards Raymond." Plaintiffs' MSJ at 13. While trying to regain control over Raymond, Officer Paul alleges that Randall "pulled my right arm, causing me to lean forward, lean to the right, and leav[e] my gun side exposed." Paul Depo. at 175:10–12. This maneuver caused Officer Paul to "lose [his] balance," so he turned around and punched Randall in the face with "a closed fist" to regain control of the situation. *Id.* at 176:15–20. Randall says that Officer Pohorence's "open palm"

push and Officer Paul's punch constituted excessive force because Randall's actions "did not interfere with the arrest [of Raymond]" and were legitimate given the Officer Defendants' "unlawful" seizure of Raymond. Plaintiffs' MSJ at 14–15. We disagree.

Both Officers testified that Randall interfered with their lawful detention of Raymond—first, by approaching to within "arms reach" after being told to "stand back" and, second, by *grabbing* Officer Paul's arm and causing him to lose his balance, thus exposing his firearm. Both acts—the failure to comply with an officer's direct command and the physical grasping of an officer during a lawful seizure—are crimes under Florida law. *See* FLA. STAT. § 843.02 ("Whoever shall resist, obstruct, or oppose any officer . . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor[.]"); *see also, e.g.*, *Wilkerson v. State*, 556 So. 2d 453, 454 (Fla. 1st DCA 1990) (affirming conviction under § 843.02 where the defendant "refused to leave" after "[a]n officer told her . . . to leave the area because she was interfering with their efforts to make the arrests"); *Francis v. State*, 736 So. 2d 97, 99 (Fla. 4th DCA 1999) (affirming conviction where the defendant "blocked [the officer's] path when he went over to investigate [the victim's] physical condition"). Once the Officer Defendants reasonably believed that Randall was interfering with their lawful seizure of Raymond, they had arguable probable cause to arrest Randall and to use reasonable force to effectuate that arrest. *See Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."); *Collins v. Ensley*, 498 F. App'x 908, 912 (11th Cir. 2012) ("In short, because probable cause or arguable probable cause existed to arrest Collins, Deputy Whittenbarger had the right to effectuate a full custodial arrest, which carried with it the attendant right to use physical coercion involving some force and injury[.]" (cleaned up)).[15]

---

[15] The Plaintiffs also contend that the quantum of force Officer Paul deployed was excessive. *See* Plaintiffs' MSJ at 15 ("The evidence in the light most favorable to Paul provides no legal justification for punching Randall Purcell."). But the degree of force each Officer deployed against Randall (*viz.*,

Although the Plaintiffs counter that Randall was entitled to resist the "unconstitutional, excessive force taking place at his home," Plaintiffs' MSJ at 15; *see also State v. Holley*, 480 So. 2d 94, 96 (Fla. 1985) ("[A defendant] may resist the use of excessive force in making the arrest."), the Defendants' version of the facts is sufficient to show that the Officers lawfully seized both Plaintiffs and that the force they deployed was appropriate, *see Whittington v. Town of Surfside*, 490 F. Supp. 2d 1239, 1251 (S.D. Fla. 2007) (Gold, J.) ("Accordingly, so long as probable cause existed to arrest Plaintiff for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses, or even all announced charges." (citing *Lee*, 284 F.3d at 1196)). We therefore **DENY** the Plaintiffs' MSJ on Count III.

### D. The State-Law Torts (Counts IV & V)

As we've said, the Plaintiffs also assert two intentional torts under state law: "assault and battery" (Count IV)[16] and false imprisonment (Count V). *See* Complaint at 24–25. Under Florida law,

---

one open palm push and a punch to the head) was appropriate given the circumstances. *See Nolin*, 207 F.3d at 1256 (holding that the "actual force" of "slamm[ing] the plaintiff against a wall [and] kick[ing] his legs apart" was "minor in nature" (cleaned up) (quoting *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997)); *Woodruff v. City of Trussville*, 434 F. App'x 852, 855 (11th Cir. 2011) ("The kind of force alleged by Woodruff—including Adams punching Woodruff in the face, forcefully removing him from his car, and slamming him on the ground—even when construed in the light most favorable to Woodruff, constituted only de minimis force."). Although we've previously recognized that the "*de minimis*" force doctrine . . . does not apply" when a "suspect has been subdued, is not resisting, and poses no threat," *Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285, 1316–17 (S.D. Fla. 2020) (Altman, J.) (quoting *Saunders v. Duke*, 766 F.3d 1262, 1269–70 (11th Cir. 2014)), this exception doesn't apply where (as here) the Plaintiffs admit that they *were resisting*, *see* Plaintiffs' SOF ¶ 12 ("Raymond resisted the attempted detention but did not offer any violence to Officers Paul or Pohorence."); Defendants' Response SOF ¶ 12 ("Undisputed[.]").

[16] Florida courts seem to recognize the intentional tort of "assault and battery." *See, e.g.*, *Herzfeld v. Herzfeld*, 781 So. 2d 1070, 1071 (Fla. 2001) ("The intentional torts alleged here are: (1) assault and battery; (2) false imprisonment; and (3) intentional infliction of emotional distress, all based on allegations of sexual abuse."); *Spivey v. Battaglia*, 258 So. 2d 815, 816 (Fla. 1972) ("An action was commenced in the Circuit Court of Orange County, Florida, wherein the petitioners, Mr. and Mrs. Spivey, brought suit against respondent for, (1) negligence, and (2) assault and battery."). Confusingly, however, Florida courts have held that, when "excessive force is used in an arrest, the ordinarily protected use of force is transformed into a battery." *City of Miami v. Sanders*, 672 So. 3d DCA 1996). We'll therefore construe the Plaintiffs' "assault and battery" count as a simple "battery" claim under Florida law.

"[b]attery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Quilling v. Price*, 894 So. 2d 1061, 1063 (Fla. 5th DCA 2005). To prevail on a false-imprisonment claim, "the plaintiff must establish four elements: '1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or color of authority and 4) which is unreasonable and unwarranted under the circumstances.'" *City of Boca Raton v. Basso*, 242 So. 3d 1141, 1143 (Fla. 4th DCA 2018) (quoting *Montejo v. Martin Mem'l Med. Ctr., Inc.*, 935 So. 2d 1266, 1268 (Fla. 4th DCA 2006)).

The parties' arguments on Counts IV and V mostly repeat what they said about Counts I through III—with one exception. On Count IV, the Defendants ask for summary judgment because "there is no evidence to support the claims that Officer Pohorence assaulted or battered Raymond," Defendants' MSJ at 12, while the Plaintiffs claim that, having had excessive force deployed against them, they were necessarily "battered [and] assaulted," Plaintiffs' MSJ at 13. As to Count V, the parties ask for summary judgment based on their conflicting perceptions about whether the Officers properly (or improperly) seized the Plaintiffs. *See* Defendants' MSJ at 15 ("[T]he undisputed facts establish that the words and conduct of Raymond and Randall constituted resistance, obstruction, or opposition of the Officers in their attempt to carry out their lawful duty."); Plaintiffs' MSJ at 13 ("After granting partial summary judgment as a matter of law on the issue of probable cause, the Court should set a jury trial for the jury to decide [the Plaintiffs'] damages for being falsely imprisoned, battered, and assaulted.").

For all the reasons we've discussed, we cannot grant either side's summary-judgment motion on these claims. Under the Plaintiffs' version of the facts, we agree that the Officer Defendants illegally seized Raymond, that both Plaintiffs were entitled to resist this unlawful detention, and that the Officers' subsequent use of force was necessarily excessive. In this scenario, then, the Plaintiffs might have prevailed on their false-imprisonment and battery claims. *See Johnson v. City of Pompano Beach*, 406

32

So. 2d 1257, 1259 (Fla. 4th DCA 1981) ("As to false [imprisonment], plaintiff was required to show that the defendants, in procuring her arrest, exercised unlawful restraint and detained her against her will."); *Kimbrel v. Clark*, 385 So. 3d 1124, 1128 (Fla. 1st DCA 2024) ("Thus, battery claims for excessive force are analyzed by focusing upon whether the amount of force used was reasonable under the circumstances. If an officer uses excessive force, the ordinarily protected use of force is transformed into a battery." (cleaned up)). On the other hand, by the Defendants' account, the Officer Defendants were legally entitled to detain the Plaintiffs and to use force to subdue their resistance. *See Senko v. Jackson*, 603 F. Supp. 3d 1299, 1316 (S.D. Fla. 2022) (Singhal, J.) ("Plaintiff cannot show that his detention was 'unlawful' or that the MBPD officers conducted it without legal authority. Accordingly, Plaintiff's false imprisonment claim fails as a matter of law. . . . In light of the conclusion above, that the officers did not use excessive force in securing Plaintiff, this Court concludes Plaintiff's state law battery claims . . . likewise fail." (cleaned up)). Since we aren't free to resolve these factual disputes, we'll let the jury resolve Counts IV and V.

As we've indicated, however, the Defendants raise an additional argument as to these state-law counts—one we haven't yet considered. In their view, the Officers "are . . . entitled to summary judgment in their favor on Randall's false arrest/imprisonment claim in Count V because there was a valid warrant for his arrest at the time Randall was arrested." Defendants' MSJ at 18. As the Officers see it, since they were entitled to arrest Randall so long as "probable cause exists on any criminal charge," *ibid.*, they were authorized to arrest Randall *even if* they didn't know it at the time, *see ibid.* ("The existence of this active warrant renders his arrest lawful, even if it was not the announced basis for taking him into custody."); *see also, e.g.*, *Daniel v. Vill. of Royal Palm Beach*, 889 So. 2d 988, 991 (Fla. 4th DCA 2004) ("The validity of an arrest does not turn on the offense announced by the officer at the time; if there is a valid charge for which a person could have been arrested, probable cause exists.").

It's an interesting argument, but the law suggests otherwise. A seizure is legal so long as law enforcement has probable cause (or reasonable suspicion) *at the time of the seizure. See United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (holding that the police must have "a particularized and objective basis for suspecting legal wrongdoing" *before* seizing a suspect (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002))). Probable cause to "arrest exists when law enforcement officials *have facts and circumstances within their knowledge* sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992) (emphasis added); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts *known to the arresting officer at the time of the arrest.*" (emphasis added)).

Our factual record suggests that the Officers *didn't* know about Randall's warrant until *after* they arrested him. *See* Pohorence Depo. at 42:1–2 ("Q: Were you executing an Arrest Warrant? A: No, sir."); Raymond Depo. at 23:23–24 ("I did not know I had a warrant until I was in jail."). That warrant thus could *not* have supported a finding of probable cause at the time of the seizure. *See Moreno v. Baca*, 431 F.3d 633, 640 (9th Cir. 2005) ("[I]t is undisputed that Appellants were not aware of the fact that Moreno was subject to an outstanding arrest warrant at the time they arrested him. Therefore, there are no facts from which we can conclude that the suspicionless arrest and search in this case were objectively justifiable."); *Gaddis v. City of Detroit*, 649 F. Supp. 3d 469, 486 (E.D. Mich. 2023) ("Since the officers did not know about the outstanding warrants 'at the time of the arrest,' the warrants cannot establish probable cause for the arrest."); *Santiago v. City of Yonkers*, 2023 WL 2648649, at *5 (S.D.N.Y. Mar. 27, 2023) ("[T]here are genuine issues of material fact as to what the Officers knew about the purported existence of an arrest warrant for Plaintiff and when they knew it, and accordingly, the Court cannot determine as a matter of law that there was probable cause to arrest Plaintiff on the basis of an active arrest warrant.").

34

Still resisting, the Defendants rely on three cases in which (they claim) district courts held that "[t]he existence of [an] active warrant renders [an] arrest lawful, even if it was not the announced basis for taking [the suspect] into custody." Defendants' MSJ at 18. But those cases say no such thing. Take, for instance, *Frappier v. City of Waterbury*, 2008 WL 4980362 (D. Conn. Nov. 20, 2008), where the arresting officer "contacted the Waterbury Police Department and observed that there was an outstanding arrest warrant issued for plaintiff" *before* the plaintiff was arrested, *id.* at *3. The Defendants' reliance on *United States v. Liverman*, 2017 WL 10259533 (N.D. Ga. Oct. 23, 2017), is equally misplaced. *See id.* at *2 ("In any event, even if the arresting officer was not personally aware of the warrant at the time of the traffic stop, *it is undisputed that the officer became aware of it during the stop*, as Liverman admitted that the arresting officer told her that there was a warrant out for her arrest." (emphasis added)). Finally, in *Omor v. City of New York*, 2015 WL 857587 (S.D.N.Y. Feb. 27, 2015), the district court agreed that the post-arrest discovery of a bench warrant "was an additional basis for finding probable cause once the warrant was discovered." *Id.* at *5. But the court clarified (in a footnote the Defendants fail to cite) that this "additional" probable cause did *not* justify the initial seizure. *See id.* at *5 n.4 ("This additional basis for probable cause does not cover the period of time between Plaintiff's removal from the HRA office and the discovery of the warrant.").

We therefore **DENY** the parties' requests for summary judgment on Counts IV and V.

### E.    Malicious Prosecution (Count VI)

In Count VI, the Plaintiffs advance a malicious-prosecution against the Officers because (they say) "[t]here was an absence of probable cause to arrest and prosecute plaintiffs[.]" Complaint ¶ 141. To "prevail in a malicious prosecution action, the plaintiff must establish: (1) the commencement or continuance of an original judicial proceeding; (2) its legal causation by the present defendant against the present plaintiff who was the defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) a lack of probable cause for such proceeding; (5) the presence of

malice; and (6) damages conforming to legal standards resulting to the present plaintiff." *Endacott v. Int'l Hospitality, Inc.*, 910 So. 2d 915, 920 (Fla. 3d DCA 2005).

Only the Defendants move for summary judgment on Count VI, arguing that the Officers had probable cause to arrest the Plaintiffs. *See* Defendants' MSJ at 19 ("As discussed above, the undisputed record facts establish that the Officers had probable cause to arrest Plaintiff, Randall, because he had an outstanding valid warrant from Kentucky for his arrest at the time the Officers arrested him, and for the crime of resisting an officer without violence. In addition, as discussed above, the Officers had probable cause to issue the Notice to Appear to Plaintiff, Raymond, for the crime of resisting an officer without violence."). But, when we view the facts in the light most favorable to the Plaintiffs, we find (again) that the Officers *didn't* have probable cause to arrest either brother. We therefore **DENY** the Defendants' MSJ on Count VI.

## II.     The Claims Against the City (Counts VII–IX)

### A.     Unconstitutional Custom (Count VII)

In Count VII, the Plaintiffs contend that the City's police department has "*de facto* polic[ies], practice[s], [and] custom[s]" of "concealing and/or suppressing officer misconduct," using "deficient and biased procedures in investigating complaints [against police officers]," and "failing to maintain accurate and complete records of complaints and investigations of misconduct." Complaint ¶¶ 148–50. The Plaintiffs argue that these allegedly unconstitutional customs "were the moving force behind [the Officer Defendants'] described conduct, depriving plaintiffs of their constitutional rights." *Id.* ¶ 158. Both parties have moved for summary judgment on Count VII. In the Defendants' view, the Plaintiffs have failed to produce *any* evidence that "the [City's] approved and accredited policies were faulty, or . . . that [the City] condones and ratifies the use of excessive force." Defendants' MSJ at 26. Conversely, the Plaintiffs insist that "[t]he summary judgment record establishes repeated failures by

IA to formally investigate numerous citizen complaints of excessive force against its employees as well as IA's failure to review officer-reported uses of force." Plaintiffs' MSJ at 18.

A municipality is not vicariously liable under § 1983 when its employees violate a person's constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("But, under § 1983, local governments are responsible for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." (cleaned up)). Instead, "a municipality may be held liable for the actions of [its employees] only when municipal 'official policy' causes a constitutional violation." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978)). Thus, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). The Supreme Court has held that "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policy making officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 (citing *Monell*, 436 U.S. at 691); *see also Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc) ("A plaintiff . . . has two methods by which to establish a [municipal] policy: identify either (1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker for the [municipality].").

The Plaintiffs claim that the City's unofficial custom or practice of "persistently fail[ing] to investigate excessive force by its officers" caused the Officer Defendants to violate the Plaintiffs' rights on April 6, 2017. Plaintiffs' MSJ at 24; *see also ibid.* ("Closing cases as a Note to File, based on a finding of no apparent policy violation, may not be authorized by written or express municipal policy, but it is a widespread and systemic practice that has been applied to a supermajority of Note to Files.

Likewise, only deciding if there is an apparent policy violation when reviewing use of force reports is not authorized by any written policy or SOP, yet it is a widespread practice.").[17] A custom exists when there's a "persistent and widespread practice[ ]" amongst municipal employees that's "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)); *see also Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) ("To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law[.] In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." (cleaned up)). Although the Eleventh Circuit has held that "a persistent failure to take disciplinary action against officers can give rise to an inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of *Monell*," *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985), the Plaintiffs must still show that the City's alleged failures were part of "[a] pattern of similar constitutional violations," since "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability," *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (cleaned up); *see also Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("Normally random acts or isolated incidents are insufficient to establish a custom or policy.").

The Plaintiffs point to two buckets of evidence to show that the City has an unofficial custom of failing "to formally investigate numerous citizen complaints of excessive force against its employees

---

[17] The Plaintiffs concede that the City's official policies (specifically, Policy 119.1 and Policy 119.3) require City officials to thoroughly investigate allegations that its police officers have used excessive force. The problem, as they see it, is that the City has an unofficial custom of ignoring these official policies. *See* Plaintiffs' MSJ at 21 ("The departure from its written policies and procedures is not trivial. The disposition has allowed [the City's] officers for more than a decade to escape formal charges and investigations into bona fide claims of misconduct.").

[and] review officer-reported uses of force." Plaintiffs' MSJ at 18. *First*, on their claim that "the City repeatedly failed to properly investigate the persistent number of citizen complaints of excessive and unnecessary force," the Plaintiffs rely on "statistics" and "select cases." *Ibid.* Specifically, the Plaintiffs claim that a statistical review of excessive-force complaints filed since 2007 shows that "less than 13% of citizen complaints resulted in formal charges that were investigated" and that "zero allegations of unnecessary or excessive force were sustained" in the "two-year period before the Purcell arrest[.]" *Id.* at 19. The Plaintiffs also rely on the complaints of "Raymond Trufant, Corey McCabe, Rafael Reme, Rodney Howard, and Ivan Kilpatrick" as proof that the City's "policies and procedures . . . were ignored by IA." *Id.* at 21. *Second*, as to the alleged "failure by the City to review use of force reports," the Plaintiffs again point to statistics and "select cases." *Id.* at 22. The Plaintiffs say that, since 2008, the City "found no apparent policy violations in more than 99 percent of its reviews [of responses to resistance]." *Ibid.* To illustrate this point, the Plaintiffs identify six *other* instances in which (they claim) our Officer Defendants used excessive force and where the City's "IA found no apparent violation, even though the reports showed apparent policy violations." *Id.* at 23.[18] The Defendants respond that

---

[18]     The Plaintiffs also use the City's (alleged) failure to properly investigate the Officer Defendants' use of force against the Purcells as *further* evidence of these unofficial customs. *See* Plaintiffs' MSJ at 21 ("IA inaccurately and incompletely reported the use of force against Randall and Raymond and failed to fully review the use of force."). They even go so far as to the suggest that "the City's admission that its treatment of the Purcell allegation of excessive force by Pohorence was in line with its policies and procedures" is enough for us to grant summary judgment in their favor on Count VII. Reply to Plaintiffs' MSJ at 12 (citing City's Response to Request for Admissions [ECF No. 121-1] at 1–2). This argument borders on frivolity for two reasons.

*First*, "a single incident of unconstitutional activity [would not be] sufficient to impose liability." *Craig*, 643 F.3d at 1310 (cleaned up). To be entitled to summary judgment on Count VII, the Plaintiffs *must* show—using statistics and individual-case studies—that the City's lackluster investigation into the Officer Defendants' use of force was part of a *larger* practice of inadequate investigations (rather than an isolated incident), and that the City's unconstitutional custom, in turn, motivated the Officer Defendants to act unconstitutionally. The Plaintiffs admit as much in their briefing. *See* Reply to Plaintiffs' MSJ at 9 ("The key question for municipal liability is whether the Purcell incident was isolated or part of a Citywide policy and practice of persistently failing to properly investigate and discipline excessive force.").

*Second*, it's well-settled that the "failure to investigate or take disciplinary action following the subject incident cannot support a claim of municipal liability, because the after-the-fact inadequate

"bare statistics, without adequate information through which to compare the prior incidents," are insufficient to establish an unconstitutional custom. Defendants' MSJ at 22.

The Defendants are entitled to summary judgment on Count VII. To explain why, we'll proceed in three parts. *First*, we'll demonstrate that the Plaintiffs' statistical evidence—standing alone and without additional context or corroborative evidence—*cannot* establish an unconstitutional custom as a matter of law. *Second*, we'll deny summary judgment for the Plaintiffs because the "select cases" they offer as a way of contextualizing their statistical evidence (when viewed in the light most favorable to the Defendants) indicates that, in each of those cases, the City conducted a sufficient investigation. *Third*, we'll grant summary judgment for the Defendants because the Plaintiffs haven't shown a widespread practice of ignoring allegations of excessive force.

### i.       Statistics, Without More, Are Insufficient to Prove a Custom

Policy 119.1 mandates that the City's police officers "shall only respond to the level of a subject's resistance with a level of response necessary to effect lawful objectives" and requires that all force be "objectively reasonable to meet the level of resistance." Policy 119.1 at 1. A citizen may submit a complaint to IA if he or she believes that a police officer has used "unnecessary/excessive force" in violation of the City's policies. IA SOP at 2. Once a complaint is made, the assigned investigator must "use the formal case file format" unless: (1) "[t]he complaint is withdrawn by the complaining party"; (2) "[s]ufficient information with corroborating documentation exists to dispute the validity of the complaint"; or (3) the complaint is "anonymous" and cannot "in any way be substantiated[.]" *Id.* at 4. If any one of these three exceptions applies, the investigator will instead prepare a "Note to File," which summarizes "the initial allegation or complaint and the reason why

---

investigation or discipline could not have been the legal cause of the plaintiff's injury." *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1374 (S.D. Fla. 2013) (Lenard, J.) (first citing *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999); and then citing *Bolander v. Taser Int'l, Inc.*, 2009 WL 2004379, at *16 (S.D. Fla. July 9, 2009) (Vitunac, Mag. J.))). In other words, the Plaintiffs must show that the allegedly unconstitutional custom existed *before* the incident in question.

no further action is being taken." *Ibid.*[19] Relatedly, Policy 119.3 requires IA officers to investigate "all reports involving the response to resistance, discharges of firearms and actions of members that result in, or is alleged to result in, injury or death to another, to determine whether or not it is consistent with Department policies and professional law enforcement standards." Policy 119.3 at 4. In addition to relying on citizen complaints, therefore, Policy 119.3 also requires IA to conduct "use of force reviews" on its own initiative to ensure that the City's police officers are complying with professional and constitutional standards.

The Plaintiffs say that there's "undisputed evidence . . . that the City has repeatedly failed to properly investigate the persistent number of citizen complaints of excessive and unnecessary force." Plaintiffs' MSJ at 18. Their primary piece of evidence for this proposition is a statistical analysis (whose accuracy is undisputed) conducted by IA investigators of *both* citizen complaints alleging excessive force *and* use-of-force reviews the IA automatically conducted. When it comes to citizen complaints, "[f]rom 2007 to [approximately November 2022], citizens filed 248 separate complaints of excessive force and unnecessary force with [IA]. Of the 220 cases closed without formal charges as Note to Files, a total of 173 (78.6%) were closed based on a finding that there was 'no apparent violation.' Since 2007, no more than 2% of use of force complaints have ended with a determination sustaining the alleged force violation." Joint SOF ¶ 92 (citing IA Pro Spreadsheet Amalgamated Data [ECF No. 121-19]). And, "[f]rom 2015 to April 2017, zero allegations of unnecessary or excessive force were sustained by IA." Plaintiffs' SOF ¶ 50; *see also* Defendants' Response SOF ¶ 50 ("Undisputed[.]"). During the same time frame (2007 through November 2022), "IA conducted 10,708 use of force reviews. 99.22% of them are recorded as no apparent policy violation. Only [0].15% were determined

---

[19] The language of the IA SOP also indicates that the IA Commander has the discretion to conduct a formal investigation *even if* one of these three exceptions applies. *See* IA SOP at 4 ("These are guidelines and some perceptions and interpretations may differ. In these instances the Internal Affairs Commander will make the decision on whether to proceed with the formal investigation.").

to not be within policy." Joint SOF ¶ 120 (cleaned up). IA found "no use of force inconsistent [with] the department policy" in 2015, 2016, and 2017, and only found that "one use of force did not comply with departmental policy" in 2019 and 2020. *Id.* ¶ 121.

The Plaintiffs view this data as a kind of smoking gun. *See* Plaintiffs' MSJ at 20 ("The statistical evidence confirms the City's admission that its investigation of excessive force complaints against Pohorence was not isolated. The data leaves no doubt that the Purcell complaint is part of the majority of citizen complaints improperly investigated by IA."); *id.* at 22 ("Applying this unauthorized practice, from 2008 to Present, the City has found no apparent policy violations in more than 99 percent of its reviews. The departure is not insignificant.").[20] We disagree.

While the numbers indicate that only a small percentage of investigations result in discipline, this fact alone tells us nothing at all about the quality of these investigations. "Indeed," our own Circuit has said, "the number of complaints bears no relation to their validity." *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987). "In Scheib's case, for example, there is a logical explanation as to why a large number of complaints have been lodged against him: Officer Scheib patrolled a high crime area. . . . The City presented testimony that each complaint was fully investigated and found to be lacking in merit. In sum, there is no evidence that would allow a jury to find that the City knew or should have known that the natural consequence of its policy and practices would be the deprivation of constitutional rights." *Ibid.* And that's the view of other circuits as well. *See, e.g.*, *Strauss v. City of Chicago*, 760 F.2d 765, 768–69 (7th Cir. 1985) ("Plaintiff suggests that the police department's sustaining only six to seven percent of all registered complaints filed for 1977, 1978 and 1979 'must give rise to a

---

[20] The Plaintiffs also insist that *every* "Note to File" that "w[as] closed based on a finding of 'no apparent violation'" must be viewed as illegitimate because the IA SOP "does not contain a 'No Apparent Violation' exception." Plaintiffs' MSJ at 20. This is silly. While we agree that the IA SOP doesn't use the specific phrase "No Apparent Violation," it's clear from the text of the IA SOP that a formal investigation needn't take place if there's "[s]ufficient information with corroborating documentation to dispute the validity of the complaint." IA SOP at 4. We think it fairly obvious that the notation "No Apparent Violation" is synonymous with this exception.

reasonable man's suspicions that defendant Chicago's methods of review are weighted to discourage positive findings.' This reasoning is specious, for the number of complaints filed, without more, indicates nothing. People may file a complaint for many reasons, or for no reason at all."); *Carter v. Dist. of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986) (joint op. of R. Ginsburg, Bork, JJ.) ("This catalog of disquieting events is not sufficient to demonstrate a pervasive pattern of police officer indulgence in the use of excessive force, persisting in the District because of the MPD's tacit approval. We can glean nothing from the seven deaths acknowledged by Police Chief Turner, because plaintiffs presented no detail at all on these incidents. The remaining occurrences are scattered and do not coalesce into a discernible 'policy.' If the evidence plaintiffs presented here were adequate to make out a § 1983 case, then practically every large metropolitan police force, it would seem, could be targeted for such liability.").

And that appears to be the consistent view among judges in our own District. *See, e.g.*, *Whitaker v. Miami-Dade County*, 126 F. Supp. 3d 1313, 1323 (S.D. Fla. 2015) (Lenard, J.) ("Here, Plaintiffs' unadorned statistics simply do not bespeak a 'municipal policy, that is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" (quoting *Brown*, 923 F.2d at 1481)); *Adams v. Custer*, 2016 WL 155081, at *19 (S.D. Fla. Jan. 12, 2016) (Hurley, J.) ("Plaintiff posits it is highly unlikely that only one officer-involved shooting out of twenty-seven resulted in a finding of officer culpability . . . coupled with the minute number of excessive force complaints resulting in officer discipline, implies a practice or custom of letting incidents of excessive force go unpunished. The Court, however, is unable to draw any probative value from these numbers as there is no statistical context or expert explanation of their meaning."), *aff'd sub nom.*, *Adams v. Sheriff of Palm Beach Cnty., Fla.*, 658 F. App'x 557 (11th Cir. 2016); *see also S.E.C. v. Monterosso*, 746 F. Supp. 2d 1253, 1261 (S.D. Fla. 2010) (Lenard, J.) ("However, a motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in

determining whether genuine issues of fact exist." (quoting *United States v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010))).

And that makes sense. We therefore won't read too much into the Plaintiffs' statistical analysis—which, as in these other cases, was presented with almost "no detail at all on [the vast majority of] these incidents." *Carter*, 795 F.2d at 123. At the same time, the Plaintiffs *have* culled eleven "select cases" for our review, and we'll turn now to a consideration of those incidents.

### ii. The Plaintiffs Aren't Entitled to Summary Judgment Based on Their "Select Cases"

Five of the Plaintiffs' cases are citizen complaints, which allegedly "presented apparent violations of City policies and procedures that were ignored by IA," Plaintiffs' MSJ at 21, and six are "[r]esponse to resistance incident summaries [which] confirm the City's failure to properly review responses to resistance," *id.* at 23. In the Defendants' view, these examples are all predicated on "self-serving[ ]" testimony, aren't supported by "admissible corroborating evidence," and "ignore discrepancies between the complainants' allegations and sworn information obtained from the officers and their reports." Response to Plaintiffs' MSJ at 8. The Defendants also observe that the failure of any given arrest to result in a conviction doesn't mean that the officer's actions were invalid—or that a subsequent investigation into that officer's conduct is illegitimate unless that investigation results in discipline to the officer. *See id.* at 9 ("[T]here is simply no merit in Plaintiffs' suggestion that a failure to convict an arrestee of the filed charges means . . . that the arrest lacked probable cause, or that the officer utilized excessive force. Unless the Judgments in those cases expressly found police misconduct, then there was no determination of police misconduct, and none can properly be assumed. Federal Courts have uniformly held that the disposition of charges, and even whether criminal charges were filed in the first instance, is irrelevant to the issue of whether probable cause existed or excessive force was used."). We agree with the City.

We'll start with the five citizen complaints: a May 9, 2016, complaint filed by Raymond Trufant; an August 25, 2016, complaint filed by Corey McCabe; a March 17, 2017, complaint filed by Rafael Reme; an August 28, 2015, complaint filed by Rodney Howard; and an April 24, 2016, complaint filed by Ivan Kilpatrick. *See generally* Plaintiffs' SOF ¶¶ 53–71. In all of these cases, the Plaintiffs say, the City "[closed] as Note to Files on grounds of no apparent policy violation and failed to discipline the officers," even though the arrestees' "criminal cases ended with jury acquittals or State Attorney dismissals." Plaintiffs' MSJ at 21.

In each of these cases, however, there was evidence that would have caused a reasonable investigator to doubt the veracity of the citizen complaint. For Raymond Trufant, the investigator reviewed "surveillance video," which showed (1) that Trufant "initiat[ed] the altercation by walking toward Officer Norvis with his arms raised" and (2) that Trufant "resisted arrest" instead of complying with the officer's orders. Trufant Notice to File [ECF No. 121-15] at 9. Corey McCabe admitted that he "walked up to Officer Wilson and began to argue" with him, and McCabe's corroborating witness "failed to show up to two scheduled appointments" to give his testimony to IA. McCabe Notice to File [ECF No. 121-15] at 34–35. Rafael Reme "apologized for his actions" and admitted that he "resist[ed] arrest" and "fought the Sergeant" because he disagreed with a city ordinance. Reme Notice to File [ECF No. 120-3] at 3. Likewise, Rodney Howard conceded "that Officer Edwards' offense report was accurate and true as it relates to his response to resistance [from Howard]." Howard Notice to File [ECF No. 121-25] at 46. The same goes for Ivan Kilpatrick, who didn't "believe Sergeant Borowski truly 'lied on his report,' but [instead] felt that someone in the Department needed to evaluate Sergeant Borowski's past misconduct files for any issues involving excessive use of force." Kilpatrick Notice of File [ECF No. 121-25] at 78. As this recitation makes plain, a reasonable jury could easily agree with the IA investigator in each of these cases that there was "[s]ufficient information with corroborating documentation . . . to dispute the validity of the complaint[.]" IA SOP

at 2.[21] We thus cannot agree that these five citizen complaints, on their face, are evidence of an unconstitutional custom.

The Plaintiffs turn next to six use-of-force reports that (the Plaintiffs believe) "confirm the City's failure to properly review responses to resistance." Plaintiffs' MSJ at 23. Those six incidents are: (1) a May 12, 2016, incident in which Officer Paul "conducted a leg sweep and guided [a juvenile] to the ground," Joint SOF ¶ 122; (2) a December 21, 2016, incident in which Officer Pohorence "drew his weapon" at a man who "enter[ed] an abandoned building," *id.* ¶ 125; (3) a February 27, 2017, incident in which Officer Campbell "directed the victim to lay prone on the ground as he pointed a gun at him," *id.* ¶ 128; (4) a March 18, 2017, incident in which Officer Paul "drew his weapon and detained an individual" who was "sleeping on the ground" but had previously been accused of brandishing a knife, *id.* ¶ 132; (5) an April 6, 2017, incident in which Officer Pohorence "unholstered his firearm" and aimed it at a person who allegedly yelled "let's do this" while holding a hammer, *id.* ¶ 134; and (6) a March 15, 2020, incident in which Officer Pohorence "initiated a felony traffic stop" and ordered the occupant out of her vehicle at gunpoint while "her two children cried inside the vehicle," *id.* ¶¶ 136–37. "For each of these reported uses of force," the Plaintiffs contend, "IA found no apparent violation, even though the reports showed apparent policy violations." Plaintiffs' MSJ at 23.

As with the citizen complaints, however, a reasonable jury could find—based on the record evidence—that all six force deployments were reasonable under the circumstances. The juvenile

---

[21] And we agree with the Defendants that the State's inability (or unwillingness) to charge (or convict) the five complainants is irrelevant. Officers may use force when their actions "are 'objectively reasonable' in light of the facts and circumstances confronting them" at the time the force was used. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Obviously, an officer may have acted reasonably in deploying force, even if a prosecutor later determines that he cannot prove a resisting charge against the arrestee *beyond a reasonable doubt*—a much higher standard than objective reasonableness. *See, e.g.*, *Foltz v. City of Largo*, 2011 WL 3919737, at *3 (M.D. Fla. Sept. 7, 2011) (Bucklew, J.) ("Upon consideration, the Court concludes that the fact that the charges against Plaintiff were *nolle prosequi* is irrelevant to Plaintiff's § 1983 excessive force claim against Martens.").

against whom Officer Paul deployed a "leg sweep" was involuntarily committed for mental-health reasons, was "combative," and "braced and tensed his arms in front of his body and resisted [the officers] handcuffing him[.]" May 12, 2016, Report [ECF No. 120-5] at 3. In the second case, Officer Pohorence drew his weapon when he observed the suspect "enter what appeared to be an abandoned building"—potentially committing a burglary—but then lowered it once he "was able to determine that [the suspect] was unarmed." December 21, 2016, Report [ECF No. 120-5] at 6. Officer Campbell pointed his gun at *both* the victim *and* the suspect because he had just been informed that there was "a disturbance where one of the parties was alleged to be armed with a firearm" and was "actively pointing it at multiple individuals." February 27, 2017, Report [ECF No. 120-5] at 27. Although Officer Paul drew his weapon on a sleeping man on March 18, 2017, he had been told that there was a "disturbance involving a knife," and the sleeping man did, in fact, keep the knife "in his bag with his other belongings." March 18, 2017, Report [ECF No. 120-5] at 47. Officer Pohorence was certainly entitled to unholster his firearm on April 6, 2017, when the suspect—who ignored "numerous" commands to drop the hammer he was holding—"turned in [the Officer's] direction and began to progress towards [his] person." April 6, 2017, Report [ECF No. 120-5] at 50. Finally, Officer Pohorence ordered the driver out of her car at gunpoint on March 15, 2020, because her vehicle's tag had been "reported as stolen." March 15, 2020, Report [ECF No. 120-5] at 78.

In all six cases, then, the officers either used force or drew their weapons for one of three reasons: (1) the suspect was resisting; (2) the officers believed a felony was being committed; or (3) the officers thought the suspect was armed. All three are perfectly good reasons for a police officer *either* to use force *or* to draw his weapon. *See Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir. 2002) ("As the Supreme Court and this Circuit have recognized, the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." (cleaned up)); *United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983) ("The use of a gun in connection with a

stop is permissible when the officer reasonably believes it is necessary for his protection."); *United States v. Ochoa*, 402 F. App'x 478, 483 (11th Cir. 2010) ("In light of their information that Ochoa was armed at all times, the officers acted reasonably in drawing their guns during the initial approach[.]" (citing *United States v. Roper*, 702 F.2d 984, 987–88 (11th Cir. 1983)); *cf. Grimes v. Yoos*, 298 F. App'x 916, 923 (11th Cir. 2008) (holding that the "use of canine force was objectively reasonable" where "it appears that the defendants had reason to believe that the serious felony crime of burglary had recently occurred").

The Plaintiffs' "select cases" thus fail to establish that the City has followed an unconstitutional custom of ignoring its officers' illegal-force deployments. On the contrary, as we've seen, each incident was fully investigated by an IA officer who concluded, based on the evidence, that the police had a reasonable basis to use force. We therefore **DENY** the Plaintiffs' MSJ on Count VII.

### iii.     The Defendants are Entitled Summary Judgment

As we've said, the Plaintiffs claim that two distinct—but closely related—customs were the "moving force behind the constitutional law violations alleged in this case": (1) the "repeated failures by IA to formally investigate numerous citizen complaints of excessive force against its employees"; and (2) "IA's failure to review officer-reported uses of force." Plaintiffs' MSJ at 2, 18. The Defendants counter that the existence of these alleged customs is "based upon nothing more than [the] unsubstantiated conclusions of these Plaintiffs" and "could not have been the legal cause of the Plaintiffs' alleged injuries." Defendants' MSJ at 26–27. We agree.

A municipality cannot be liable under *Monell* unless the plaintiff "prove[s] causation by demonstrating that the municipality's deliberate conduct was the moving force behind his injury." *McDowell*, 392 F.3d at 1292. A plaintiff can accomplish this by showing that there was a "pattern of *similar* constitutional violations" from which "deliberate indifference [to the plaintiff's constitutional rights] can be inferred[.]" *Craig*, 643 F.3d at 1310–11 (emphasis added & cleaned up); *see also Mercado*

*v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) ("During discovery, [Mercado] was given a list of all cases involving excessive force, but he cannot show that any of them involved factual situations that are substantially similar to the case at hand. For this reason, the district court did not abuse its discretion, and the dismissal of Mercado's *Monell* claim . . . should be affirmed."). The custom "must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it[.]" *Craig*, 643 F.3d at 1310 (cleaned up). Where, as here, a plaintiff alleges that a municipality failed to investigate unconstitutional actions by its employees, the plaintiff must present evidence from which a reasonable jury can infer that the alleged acts occurred. *See, e.g.*, *Pellegrino v. Wengert*, 2016 WL 3690047, at *7 (S.D. Fla. July 12, 2016) (Bloom, J.) ("Courts, however, have held that 'a list of complaints against police officers, without more, is insufficient to create an issue of fact regarding a municipality's policy of inadequately investigating or disciplining its police officers. Rather, the Plaintiff must present at least some evidence from which a reasonable jury could infer that the complaints were meritorious.'" (quoting *Ayton v. Orange Cnty. Sheriff Dep't*, 2012 WL 4711911, at *3 (M.D. Fla. Oct. 3, 2012) (Antoon, J.))); *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1373–74 (S.D. Fla. 2013) (Lenard, J.) (same). The Plaintiffs have failed to present any such evidence of meritorious complaints here.

To begin with, five of the six use-of-force reports the Plaintiffs rely on involved incidents that were very different from ours—far too different for us to discern any relevant custom. Whereas the officers in each of those cases drew his weapon, *see ante*, at 46–47, our Officers never brandished their firearms and no one alleges that they did. So, even if the City had a custom of failing to investigate (or discipline) an officer's reckless decision to brandish his firearm unnecessarily, we don't see how that custom could have been the "moving force" behind *our* Officer Defendants' allegedly unconstitutional acts against the Plaintiffs (which didn't involve firearms at all). *See Mercado*, 407 F.3d at 1162 ("[A] plaintiff could not establish a *Monell* claim when he could not point to any other incidents involving

49

similar facts." (citing *Gold*, 151 F.3d at 1351)). We'll therefore disregard these five incidents because they aren't sufficiently similar to the constitutional violations our Plaintiffs have identified here.[22]

To sum up, in their efforts to identify an unconstitutional custom that was the "moving force" behind their constitutional injuries, the Plaintiffs have produced: (1) five citizen complaints that weren't formally investigated; (2) a single use-of-force report in which Officer Paul (the Plaintiffs say) should have been disciplined for using excessive force; and (3) data from which the Plaintiffs infer that, somewhere, there *must be* other incidents that were never properly investigated. But here's the thing: Even if we assume that the City indeed ignored evidence and failed to adequately investigate these six instances of (allegedly) problematic police behavior, a mere *six instances of misconduct in the fifteen years between 2007 and 2022* comes nowhere close to establishing "a longstanding and widespread practice[.]" *Craig*, 643 F.3d at 1310 (cleaned up); *see also Whitaker*, 126 F. Supp. 3d at 1321 ("[E]ven assuming these four isolated shootings in 2012 were deemed to be unconstitutional uses of excessive force . . . the Court does not accept Plaintiffs' legal conclusion that the prior shootings constitute the sort of occurrence that is  obvious, flagrant, rampant and of continued duration that would establish a causal connection between actions of the supervising official and the alleged constitutional deprivation." (cleaned up)); *Pellegrino*, 2016 WL 3690047, at *8 ("The only record evidence before this Court consists of unsubstantiated complaints against one deputy within a 5,300 person agency and one detective's successful whistleblower case. Plaintiffs have not met their burden of demonstrating that there is a widespread custom or ratification of excessive force[.]"); *Adams*, 2016 WL 155081, at *19 ("Even if the Court were to assume, *arguendo,* that the four isolated shootings referenced by plaintiff did involve unconstitutional use of excessive force, this evidence falls far short of establishing a pattern that is so 'obvious, flagrant, rampant and of continued duration' and that would establish a

---

[22] For the reasons we'll explain in the next paragraph, we'd still grant summary judgment for the City on Count VII, even if we *had* considered these five incidents.

'causal connection' between actions of the Sheriff and the alleged constitutional deprivations." (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999))).[23]

In the end, the Plaintiffs' municipal-liability claim is premised on a mere six incidents over fifteen years and the faulty inferences they want us to draw from decontextualized statistical data. That's not nearly enough to establish "[a] pattern of similar constitutional violations[.]" *Connick*, 563 U.S. at 62. If the Plaintiffs' threadbare evidence were "adequate to make out a § 1983 case, then practically every large metropolitan police force . . . could be targeted for such liability." *Carter*, 795 F.2d at 123. We therefore **GRANT** the Defendants' MSJ on Count VII.

## B. Vicarious Liability on State-Law Torts (Counts VIII and IX)

In Counts VIII and IX, the Plaintiffs seek to hold the City vicariously liable for the Officer Defendants' alleged battery (Count IV) and false imprisonment (Count V). *See* Complaint ¶¶ 167, 175 ("Pursuant to Florida Statute 768.28(9), the City is vicariously liable."). Generally, the State of Florida and its agencies are immune "from liability for claims arising under Florida law or common law" unless the State has waived its immunity "by legislative enactment or constitutional amendment." *Klonis v. State, Dep't of Revenue*, 766 So. 2d 1186, 1189 (Fla. 1st DCA 2000). In FLA. STAT. § 768.28, the State of Florida "waive[d] sovereign immunity from liability in tort actions 'for any act for which a private

---

[23] And our Court isn't alone in saying so. *See Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) ("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."); *Jones v. Muskegon Cnty.*, 625 F.3d 935, 946 (6th Cir. 2010) ("Although Plaintiff did present evidence that several inmates' medical requests were ignored by jail personnel, including Jones's, a jury could not reasonably infer from these five incidents alone that the County had a widespread, permanent, and well-settled custom of ignoring inmate requests."); *Charudattan v. Darnell*, 510 F. Supp. 3d 1101, 1115 (N.D. Fla. 2020) (Winsor, J.) ("To succeed, Plaintiffs would need to demonstrate 'a persistent and wide-spread practice' that could support municipal liability. Five posts over the course of more than two years is insufficient to establish municipal liability based on an informal policy or custom." (quoting *Depew*, 787 F.2d at 1499)); *Vess v. City of Dallas*, 608 F. Supp. 3d 434, 450–51 (N.D. Tex. 2022) ("[E]ven assuming *arguendo* that Vess has pleaded four instances of refusal to render aid, his allegations of a few or multiple incidents over the course of a decade or longer (in a city the size of Dallas) are insufficient to plausibly allege a pattern so well-settled as to constitute municipal policy.").

person under similar circumstances would be held liable.'" *Pollock v. Fla. Dep't of Highway Patrol*, 882

So. 2d 928, 932 (Fla. 2004) (quoting *Henderson v. Bowden*, 737 So. 2d 532, 534–35 (Fla. 1999)).

But a state entity doesn't waive its immunity—and thus cannot be held liable—"where its

employee's actions were malicious, in bad faith, or showed reckless and wanton disregard for human

rights, safety, or property." *Fletcher v. City of Miami*, 567 F. Supp. 2d 1389, 1394 (S.D. Fla. 2008)

(Altonaga, J.) (citing FLA. STAT. § 768.28(9)). Since either the agency or the employee (but not both)

can be held liable under Florida tort law, liability under § 768.28 turns on whether the employee's acts

were malicious or in bad faith. *See McGhee v. Volusia Cnty.*, 679 So. 2d 729, 733 (Fla. 1996) ("In any

given situation either the agency can be held liable under Florida law, or the employee, but not both.").

As another judge of our Court recently explained:

> Viewing these provisions as an interconnected whole, § 768.28(9)(a) thus creates a
> bifurcated tort liability scheme for public entities and their employees. Suits may
> proceed against an employee only if he (i) acted outside the course and scope of his
> employment, or (ii) committed a tort in bad faith or with malicious purpose or in a
> manner exhibiting wanton and willful disregard of human rights, safety, or property.
> In all other circumstances, the case must proceed against the public agency where the
> employee works. The effect of § 768.28(9)(a) is two mutually exclusive outcomes[.] . .
> . State officers, employees, or agents are entitled to statutory immunity when acting
> within the scope of their employment and without bad faith, malice, or in a manner
> exhibiting wanton and willful disregard of human rights, safety, or property.
> Conversely, the state entity is entitled to sovereign immunity where the employee acts
> outside the scope of employment or when he or she acts with bad faith, malice, or in
> a manner exhibiting wanton and willful disregard of human rights, safety, or property.

*Ratlieff v. City of Ft. Lauderdale*, 2024 WL 4039849, at *49 (S.D. Fla. Sept. 4, 2024) (Ruiz, J.) (cleaned

up).[24]

---

[24] Although § 768.28(9) creates two mutually exclusive remedies for torts committed by a State
employee, Florida law allows the Plaintiff to plead both in the alternative. *See Johnson v. State Dep't of
Health & Rehab. Servs.*, 695 So. 2d 927, 930–31 (Fla. 2d DCA 1997) ("Johnson can therefore make
claims against HRS and the City for acts of Sackett and Clemento committed within the scope of their
employment and, in the alternative, pursue personal liability of these defendants for acts 'in bad faith
or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights,
safety or property.'" (quoting FLA. STAT. § 768.28(9)(a))); *Petithomme v. Cnty. of Miami-Dade*, 2011 WL
3648622, at *3 n.2 (S.D. Fla. Aug. 16, 2011) (Seitz, J.) ("The nature of Florida Statutes § 768.28 tends
to require a plaintiff to plead alternative and inconsistent claims against a governmental entity and its

The Defendants have moved for summary judgment on the application of § 768.28(9). They contend that, assuming the Officer Defendants committed a tort, the City cannot be liable for their actions because the "Plaintiffs have testified that they were brutally attacked by law enforcement officers for no reason"—a kind of police conduct that, if true, can only be described as malicious and in bad faith. Defendants' MSJ at 28–29. The Plaintiffs' position on these counts is, in a word, confusing. On the one hand, the Plaintiffs appear to suggest that the Officer Defendants' intent— their state of mind—must be decided a jury. *See* Plaintiffs' MSJ at 16 ("If the jury finds the officers did not act in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, then the City is personally liable as alleged in Counts VIII and IX, if the jury, finds the officers acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, then the officers are personally liable as alleged in Counts IV and V."). On the other hand, the Plaintiffs ask us to grant summary judgment *for them* on this issue *without* waiting for a jury. *See ibid.* ("The Plaintiffs accordingly seek summary judgment on any City affirmative defense of sovereign immunity. . . . The Plaintiffs accordingly seek summary judgment on any affirmative defense of sovereign immunity by the Defendant officers.").[25]

We needn't resolve these discordant arguments because the answer here is obvious: Both MSJs must be denied because a jury should decide whether the Officer Defendants acted maliciously (or in bad faith). In their sole argument on this issue, the Defendants say that, if the Officers *did* engage in misconduct, then they *must* have engaged in that misconduct maliciously (or in bad faith) because the

---

employees. This is because a plaintiff can recover from the individual employees on the basis of their bad faith and malicious conduct, but only in the absence of such bad faith and malicious conduct may a plaintiff recover from the governmental entity." (cleaned up)).

[25] The Plaintiffs also argue that "the City has waived its sovereign immunity defense by failing to raise it in its answer and affirmative defenses." Response to Defendants' MSJ at 29. But the City did advance this defense in its Answer. *See* Defendant City's Answer and Defenses [ECF No. 13] ¶ 182 ("The Defendant City is entitled to all of the terms, benefits and limitations of liability set forth in Florida Statute Section 768.28 et seq.").

Plaintiffs said so. *See* Reply to Defendants' MSJ at 19 ("[B]oth Plaintiffs testified not only that it was their contention that the officers acted in bad faith and with malice but offered their factual premise that they were arrested and beaten despite not having engaged in any unlawful conduct whatsoever."); *see also* Defendants' MSJ at 27 ("Plaintiffs, through their sworn interrogatory answers and deposition testimony, have elected a remedy which forecloses the continued maintenance of common law tort claims against [the City].").

And that's true: The Plaintiffs did say that. *See* Raymond Depo. at 140:24–141:2 ("[Q:] Is it your contention as the plaintiff in this lawsuit that the individual officers acted in bad faith towards you? A: They damn sure did."); *see also* Randall Depo. at 94:6–15 ("Q: So based upon the way you observed these events, would it be your testimony that the officers acted in bad faith towards your brother? . . . A: Yes, sir. Q: And was it your impression, is it your testimony that they acted maliciously towards him? . . . A: Yes, sir."). But, even assuming that the Plaintiffs' testimony can establish the Officer Defendants' state of mind for summary-judgment purposes, Officer Paul denied that he acted maliciously or in bad faith. *See* Paul Depo. at 158:16–20 ("Q: Mr. Paul, do you believe you acted in bad faith? A: No. Q: Did you act with malicious purpose? A: No, sir."). We can't accept the Plaintiffs' testimony about the Officer Defendants' states of mind as undisputed where at least one of the Officers has flatly denied acting with ill intent.[26]

Instead, for the City to be immune under § 768.28(9), we must be convinced that the Officer Defendants "[were] acting in bad faith or with a malicious purpose or in a manner exhibiting wanton

---

[26] The cases the Defendants cite in support of this argument merely held that courts *can* resolve vicarious-liability claims on a motion to dismiss *if* the plaintiff's complaint conclusively establishes that the municipality's employees acted in bad faith. *See, e.g.*, *Jones v. City of Palm Beach Gardens*, 2022 WL 16745733, at *3 (S.D. Fla. Nov. 7, 2022) (Scola, J.) (explaining that the court "based its decision" to dismiss the vicarious-liability claims "wholly on the Plaintiff's pleadings"); *Blue v. Miami-Dade Cnty.*, 2011 WL 2447699, at *3 (S.D. Fla. June 15, 2011) (Huck, J.) ("[T]he Court can make the bad faith determination based on the facts alleged in Plaintiff Blue's complaint."). Given the divergent testimony about the extent to which our Officer Defendants acted in bad faith, these cases simply aren't relevant here.

and willful disregard of human rights, safety, or property." *HTNB Corp. v. Milstead*, 369 So. 3d 749, 754 (Fla. 3d DCA 2023). "To avoid liability, there must be conduct much more reprehensible and unacceptable than a mere intentional tort." *Duyser by Duyser v. Sch. Bd. of Broward Cnty.*, 573 So. 2d 130, 131 (Fla. 4th DCA 1991). Whether "the question of bad faith, malice, or willful and wanton conduct [should] be sent to the jury" depends on whether the defendants' acts, as alleged, could be described as "far more than mere negligence." *HTNB Corp.*, 369 So. 3d at 745; *see also Butler v. Gualtieri*, 41 F.4th 1329, 1338 (11th Cir. 2022) ("[W]e agree with the district court that sovereign immunity cannot be resolved on summary judgment. Plainly, there are material factual disputes about the precise actions Butler and Gee took on the night of January 8, 2019, about Gee's state of mind, and about the inferences that might reasonably be drawn from them. As we see it, reasonable factfinders could disagree over whether Gee's conduct was wanton and willful, malicious, or exhibitive of bad faith."); *Gualtieri v. Bogle*, 343 So. 3d 1267, 1274 (Fla. 2d DCA 2022) ("Here, taking the allegations in Bogle's second amended complaint as true, we cannot agree with Appellants' position that Deputy Lyons' conduct was of the type that could *only occur* from bad faith, malicious intent, or willful and wanton disregard." (emphasis added)); *but cf. Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004) ("[The Florida Supreme Court] explicitly disavowed the proposition that the question of bad faith must always be submitted to the fact-finder[.]" (citing *McGhee*, 679 So. 2d at 733 n.7)); *Ratliff*, 2024 WL 4039849, at *49 ("[S]overeign immunity can be decided as a matter of law when the facts compel that outcome." (quoting *Strong v. City of Naples*, 2022 WL 14029702, at *2 (M.D. Fla. Oct. 24, 2022) (Dudek, Mag. J.))).

As this Order should have made plain, there are, on this record, too many disputed facts for us to say with confidence what each Officer's state of mind was on the night of April 6, 2017. It's certainly possible that the Officer Defendants deliberately and maliciously attacked the Purcells merely because they were offended by Raymond's attitude. But it's equally possible that the Officer Defendants' actions were completely justified based on a reasonable fear that Raymond would arm

55

himself. Or it could be that the Officer Defendants' actions were motivated by fear and incompetence rather than hate and cruelty. And, of course, the truth could lie somewhere in between. *Cf.* Robert M. Lloyd, *Making Contracts Relevant: Thirteen Lessons for the First-Year Contracts Class*, 36 ARIZ. ST. L. J. 257, 279 (2004) ("As Don Henley put it, 'There's three sides to every story: Yours and mine and the cold, hard truth.'" (quoting DON HENLEY, *Long Way Home*, *on* I CAN'T STAND STILL (Elektra Records 1982))). We therefore **DENY** the MSJs on Counts VIII and IX.

CONCLUSION

Accordingly, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' MSJ [ECF No. 110] is **GRANTED in part** and **DENIED in part**. Summary judgment is **GRANTED** in favor of the City of Fort Lauderdale on Count VII. The Defendants' MSJ is **DENIED** is all other respects.

2. The Plaintiffs' MSJ [ECF No. 113] is **DENIED**.

3. The Clerk is directed to **REOPEN** this case and **LIFT** the stay.

**DONE AND ORDERED** in the Southern District of Florida on October 15, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record